UNITED STATES OF AMERICA, v.
HECTOR RUIZ, WILLIAM DUQUE, and JAMES DUQUE    Case 1:... Document 8-2    Filed 02/01/2008    Page 1 of 23

Trial Volume 1
June 11, 2003

**Page 88**

[1] Q: Were there other members of your group conducting
[2] surveillance in the area?

[3] A: Yes.

[4] Q: Were you in contact with them?

[5] A: Yes, I was.

[6] Q: And were you in contact with the person who was monitoring
[7] the recording device that Jose Diaz was wearing?

[8] A: Yes.

[9] Q: How were you in contact with these people?

[10] A: Via radio.

[11] Q: And what was the next thing that you saw?

[12] A: I saw the vehicle start to proceed down 108th Street and I
[13] began to follow it. And then I saw the vehicle pull over,
[14] informant vehicle, pull over a few blocks later.

[15] Q: Which side of the street did Jose Diaz's car pull over
[16] onto?

[17] A: On the right side.

[18] Q: What did you do when you — when Jose Diaz's car pulled
[19] over to the right side of the street?

[20] A: I was in my vehicle. I was stopped at the time because I
[21] was at a traffic light.

[22] Q: Approximately how far away from Jose Diaz's car were you
[23] when you saw it pull over to the right side of the street?

[24] A: I was right next to it.

[25] Q: What did you see next?

**Page 89**

[1] A: I saw the informant, Jose Diaz, and Hector Carvajal get out
[2] of the vehicle, approach the trunk of the informant vehicle,
[3] and then I saw Hector Carvajal take a suitcase from the trunk
[4] of the vehicle and then walk towards a Jeep Cherokee that was
[5] parked in front of the informant vehicle.

[6] Q: Which direction did you see him walk when he took the
[7] suitcase out of the car?

[8] A: Towards the front of the vehicle, towards the front of the
[9] informant vehicle.

[10] Q: Did he walk to the right of the vehicle or to the left of
[11] the vehicle?

[12] A: He walked on the right side, not the driver's side, the
[13] passenger's side of the vehicle on the sidewalk towards the
[14] Jeep Cherokee that was parked in front of the informant
[15] vehicle.

[16] Q: What suitcase was it that Hector Carvajal took out of Jose
[17] Diaz's car?

[18] A: The duplicate or similar-looking suitcase that we had
[19] provided the informant to turn over to Carvajal.

[20] Q: That was the suitcase without the heroin lining?

[21] A: Correct, suitcase without the heroin.

[22] Q: You said you saw Hector Carvajal walk forward to a Jeep
[23] Cherokee. Where was the Jeep Cherokee in relation to where
[24] Jose Diaz's car was?

[25] A: It was in front of it, parked over to the right of the

**Page 90**

[1] street, right side of the street, maybe ten yards in front of
[2] it.

[3] Q: Did you recognize that Jeep Cherokee?

[4] A: I recognize the Jeep Cherokee, yes.

[5] Q: How did you recognize it?

[6] A: I recognized it as the Jeep Cherokee that had been seen on
[7] previous surveillances.

[8] Q: That's the Jeep Cherokee that was registered in the name
[9] Hector Ruiz?

[10] A: Yes.

[11] Q: What did you see happen when Hector Carvajal got up to the
[12] Jeep Cherokee?

[13] A: I saw him get into the vehicle, put the suitcase in back,
[14] and then get into the vehicle.

[15] Q: Where did Hector Carvajal get into the Jeep Cherokee?

[16] A: The front passenger side.

[17] Q: And what happened after he got into the Jeep Cherokee on
[18] the front passenger side?

[19] A: At that time the arrest signal was given.

[20] Q: What did you do?

[21] A: I pulled my vehicle in front of the Jeep Cherokee and moved
[22] in to make the arrest.

[23] Q: When you say you moved in to make the arrest, where did you
[24] go?

[25] A: I came out of my driver's side of my vehicle around the

**Page 91**

[1] back of it and approached the driver's side of the Jeep
[2] Cherokee.

[3] Q: Did you see someone in the driver's seat?

[4] A: Yes, I did.

[5] Q: Do you see the person who was in the driver's seat of the
[6] Jeep Cherokee on the evening of September 15 in the courtroom
[7] today?

[8] A: Yes, I do.

[9] Q: Can you point to him and indicate an article of clothing
[10] that he is wearing?

[11] A: Yes. He is the third individual from the left.

[12] MR. EISEMANN: Judge, I'll stipulate it's my client,
[13] Hector Ruiz.

[14] THE COURT: The record will so reflect.

[15] Q: I will show you what was marked for identification as
[16] Government Exhibit 114. Do you recognize it?

[17] A: Yes, I do.

[18] Q: What is Government Exhibit 114?

[19] A: It's a photograph of Hector Ruiz.

[20] MS. GOLDBERG: The government offers Government
[21] Exhibit 114 and 115.

[22] MR. EISEMANN: Can I just see it?

[23] No objection.

[24] THE COURT: I'll allow it.

[25] (Government's Exhibits 114 and 115 received in

Page 92

] evidence)

]    **MS. GOLDBERG:** May I show it to the jury, your Honor?

]    **THE COURT:** Sure.

]    **Q:** What did you do, Agent Galbadis, when you got to the

] driver's side of the Jeep Cherokee?

]    **A:** I instructed Mr. Ruiz to get out of the vehicle. I then

] placed him under arrest.

]    **Q:** Were there other agents approaching the Jeep at about the

] same time?

]    **A:** Yes, there were.

]    **Q:** What did you do after you placed Hector Ruiz under arrest?

]    **A:** He was handcuffed and then searched.

]    **Q:** What, if anything, did you recover from him?

]    **A:** A wallet containing miscellaneous papers and business

] cards.

]    **Q:** I am going to show you what's marked for identification as

] Government Exhibit 117.

]    Do you recognize what's marked as Government Exhibit

] 117?

]    **A:** Yes, I do.

]    **Q:** What is it?

]    **A:** It's a piece of paper that was seized from Hector Ruiz.

]    **Q:** And how did you recognize Government Exhibit 117?

]    **A:** My initials are on the paper.

]    **Q:** Is it in substantially the same condition as it was when

Page 93

] you took it from Hector Ruiz on September 15?

]    **A:** Yes, it is.

]    **MS. GOLDBERG:** The government offers Government

] Exhibit 117.

]    **MR. EISEMANN:** May I see it, please. We are going to

] look at the other ones that they are about to offer so we don't

] have to go through it again.

]    **THE COURT:** Do we have a comment on this exhibit? Any

] objection?

]    **MR. BUCHWALD:** Objection as to relevance.

]    **THE COURT:** That one is overruled.

]    **MR. EISEMANN:** No objection to 117.

]    **THE COURT:** I'm going to allow it.

]    (Government's Exhibit 117 received in evidence)

   **Q:** Agent Galbadis, I am going to ask you — unfortunately, our
projector is not working. Can you just read what's written on
Government Exhibit 117?

   **A:** Yes. The number 402-3360. Underneath is a name Papalito.

   **Q:** Do you recognize that phone number?

   **A:** Yes, I do.

   **Q:** How do you recognize it that number?

   **A:** I recognize it as a telephone number for Hector Carvajal.

   **Q:** How is it that you recognize that number?

   **A:** That was the telephone number that was provided to me by
the informant for Hector Carvajal.

Page 94

[1]    **Q:** Is it a number that you also dialed to make phone calls

[2] during the investigation?

[3]    **A:** Yes, it is.

[4]    **Q:** In order for Jose Diaz to speak to Hector Carvajal?

[5]    **A:** Yes, it is.

[6]    **MS. GOLDBERG:** Can I just show it to the jury, your

[7] Honor?

[8]    **THE COURT:** Yes.

[9]    **Q:** I am going to show you what's marked for identification as

[10] Government Exhibit 118.

[11]    Do you recognize Government Exhibit 118?

[12]    **A:** Yes, I do.

[13]    **Q:** What is it?

[14]    **A:** It's a business card that was seized from Hector Ruiz on

[15] the evening of his arrest.

[16]    **Q:** And how do you recognize it?

[17]    **A:** My initials are on the business card.

[18]    **Q:** Is it in substantially the same condition as it was when

[19] you took it from Hector Ruiz?

[20]    **A:** Yes, it is.

[21]    **MS. GOLDBERG:** The government offers Government

[22] Exhibit 118.

[23]    **MR. BUCHWALD:** Objection, relevance.

[24]    **THE COURT:** Overruled. Any others?

[25] I'll allow it.

Page 95

[1]    (Government's Exhibit 118 received in evidence)

[2]    **Q:** Agent Galbadis, I am going to ask you to turn to the

[3] white — the side of the business card that doesn't have any

[4] preprinted writing on it. And if you look about four lines

[5] down there is some writing there. Can you tell us what color

[6] the writing is in?

[7]    **A:** The writing is in purple, purple ink.

[8]    **Q:** The other side of Government Exhibit 118, the fifth line

[9] down there is some writing. Can you tell us what color that

[10] writing is in?

[11]    **A:** Purple ink.

[12]    **Q:** Can you read for us what it says there on the fifth line

[13] down?

[14]    **A:** Yes. It says the name Papalito and the telephone number

[15] 1-917-443-1937.

[16]    **Q:** First of all, the name Papalito, is that the same name that

[17] was written on Government Exhibit 117?

[18]    **A:** Yes.

[19]    **Q:** The number 917-443-1937, do you recognize that telephone

[20] number?

[21]    **A:** Yes, I do.

[22]    **Q:** And what do you recognize it to be?

[23]    **A:** I recognize it as a number that I dialed during recorded

[24] telephone conversations between the informant, Jose Diaz, and

[25] Hector Carvajal.

Page 96

[1] Q: Finally, I am going to show you what's been marked for
[2] identification as Government Exhibit 119.

Do you recognize that?

[4] A: Yes, I do.

[5] Q: What is Government Exhibit 119?

[6] A: It's a piece of paper that was seized from Hector Ruiz when
[7] he was arrested.

[8] Q: How do you recognize it?

[9] A: My initials are on it.

[10] Q: Is it in substantially the same condition as it was when
[11] you took it from Hector Ruiz?

[12] A: Yes, it is.

[13] MS. GOLDBERG: The government offers Government
[14] Exhibit 119.

[15] MR. EISEMANN: Your Honor, I don't object that it's
[16] taken from my client. Without a foundation as to how it makes
[17] the information on this paper relevant, I object to it in this
[18] case.

[19] THE COURT: I am not sure I understand the objection.

[20] MR. BUCHWALD: Objection. Relevance, hearsay.

[21] THE COURT: I am going to allow it.

[22] MR. EISEMANN: I'd like to voir dire on the question
[23] of relevance, whether it has anything with respect to this
[24] case, if I can do a brief voir dire on that.

[25] THE COURT: Sure. Go ahead.

Page 97

**VOIR DIRE EXAMINATION**

**BY MR. EISEMANN:**

[3] Q: Good morning, Agent Galbadis, or good afternoon.

[4] A: Good afternoon.

[5] Q: Without revealing yet what is on that document, there are
[6] names and there are numbers on that, numerals on that document,
[7] correct?

[8] A: That's correct.

[9] Q: There is no name on that document that is connected with
[10] any of the individuals that you have testified about today, is
[11] that correct?

[12] A: It appears to be nicknames, but no names that I know of
[13] that are connected to the individuals that were previously
[14] mentioned.

[15] Q: With respect to the numbers that are on that document,
[16] there are no numbers that correspond to any of the testimony
[17] that you have given about the evidence in this case, do they?
[18] That was a bad question. Let me rephrase it.

[19] There are no numbers on this document that correspond
[20] to any of the events that you have described in this particular
[21] case, is that correct?

[22] A: I don't know if these numbers are connected to any of the
[23] events that I spoke of previously.

[24] Q: You just don't know?

[25] A: I don't know.

Page 98

[1] Q: You have no reason to believe that they are connected, you
[2] have no reason to believe they are not connected?

[3] A: Besides the fact that they are consistent with my
[4] experience that it looks like a chit sheet or drug ledger.

[5] MR. EISEMANN: Judge, since it's based on just his own
[6] experience that these are consistent, I actually press the
[7] objection because he hasn't established that they are connected
[8] to this case. If he had numbers that connected to this case,
[9] perhaps it's relevant. Otherwise, it's speculation.

[10] MS. GOLDBERG: Your Honor, the fact that this exhibit,
[11] document was seized from the defendant and the fact that Agent
[12] Galbadis is going to testify based on his experience what it's
[13] consistent with makes it relevant.

[14] THE COURT: I'll allow it subject to connection.

[15] (Government's Exhibit 119 received in evidence)

[16] MR. EISEMANN: I'll reserve the motion to strike.

[17] **BY MS. GOLDBERG:**

[18] Q: Agent Galbadis, this is one of the sides of Government
[19] Exhibit 119, correct?

[20] A: That's correct.

[21] Q: And can you just describe for us what, based on your
[22] experience, this is?

[23] A: Again, based on my training and experience, it's consistent
[24] with what looks like a drug ledger or what we call a chit
[25] sheet.

Page 99

[1] Q: What's a chit sheet?

[2] A: Basically, it's just a sheet that — piece of paper that a
[3] drug trafficker may have with him indicating amounts that are
[4] owed by different individuals, typically customers.

[5] Q: And is there anything specific about the names and the
[6] numbers and the way they appear on Government Exhibit 119 that
[7] leads you to the conclusion that it's consistent with the drug
[8] ledger?

[9] A: Yes. As you see, there is names on the left-hand side and
[10] then you have amounts to the right of each name. And then
[11] there is some tallies — these amounts are then totaled up.
[12] Then there is some corrections, it looks like, and the total
[13] amount at the bottom.

[14] Q: If you could just read the numbers, because I'm not a
[15] hundred percent sure it's clear for the jury to see. The
[16] numbers that are crossed out, do they appear to you to be
[17] totals of numbers above them? Can you read what they say?

[18] A: If you see in the second line down there is the name Favio
[19] and with an amount of 115. About five names down you see that
[20] the name Favio is written again with another amount that's
[21] crossed out. I think you have the amount of 400 written
[22] underneath that.

[23] Q: Can you tell the amount that's crossed out above the 400,
[24] are you able to tell from looking at it closer up what that
[25] number is?

ne 11, 2003    Case 1:07-cv-09461-RMB-THK    Document 8-2    Filed 03/01/2008    Page 4 of 23

HECTOR RUIZ, WILLIAM DUQUE, and JAMES DUQUE,    UNITED STATES OF AMERICA,    v.

**Page 100**

**A:** It looks like —

**MR. EISEMANN:** Objection.

**THE COURT:** Overruled. If you know.

**A:** It looks like 700 to me.

**Q:** And the second line down where it's crossed out, what does that number say?

**A:** 2500.

**Q:** The second line from the top?

**A:** 1150.

**Q:** And Agent Galbadis, how many grams are in a kilogram of narcotics?

**MR. EISEMANN:** Objection.

**Q:** How many grams are in a kilogram?

**A:** 1,000.

**Q:** And this Government Exhibit 119 was retrieved by you from Hector Ruiz's person?

**A:** Yes, it was.

**Q:** Where was it taken from?

**A:** It was taken from his wallet.

**Q:** What happened to the replacement suitcase that Hector Carvajal had taken out of Jose Diaz's car and put in the Jeep?

**A:** It was recovered from the Jeep Cherokee by agents.

**Q:** Was Hector Carvajal also arrested at the same time that you placed Hector Ruiz under arrest?

**A:** Yes, he was.

**Page 101**

**Q:** Did you speak with Jose Diaz after the arrest of Hector Ruiz and Hector Carvajal?

**A:** Yes, I did.

**Q:** What, if anything, did he give you when you spoke with him?

**A:** He gave us the transmitter that he was wearing, the microcassette recorder, and the sum of money.

**Q:** How much money did he give you?

**A:** I believe it was approximately $480.

**Q:** That was money he had been given by Hector Carvajal?

**A:** That's correct.

**Q:** What did you do with the money?

**A:** The money was eventually returned to DEA, sealed in an evidence bag, and then submitted as evidence.

**Q:** Did there come a time that you learned, Agent Galbadis, that William Duque had been arrested in Aruba?

**A:** Yes.

**Q:** And did you also learn the name of the individual who had been driving the green car that you saw on September 15?

**A:** Yes, I did.

**Q:** What was his name?

**A:** James Duque.

**Q:** Were both William Duque and James Duque ultimately brought to the United States following their arrest?

**A:** Yes, they were.

**Q:** Who was responsible for transporting William Duque from

**Page 102**

[1] Aruba to the United States?

[2]    **A:** The United States Marshal's Service.

[3]    **Q:** What, if anything, did you receive from a member of the

[4] marshal's service when William Duque arrived in the United

[5] States?

[6]    **A:** I received some personal belongings of William Duque

[7] consisting of a passport, a wallet and some miscellaneous

[8] identification and some miscellaneous papers and cards.

[9]    **Q:** I am going to show you what's marked for identification as

[10] Government Exhibit 120. Do you recognize Government Exhibit

[11] 120?

[12]    **A:** Yes, I do.

[13]    **Q:** What is it?

[14]    **A:** It's a Colombian identification card belonging to William

[15] Saenz Duque.

[16]    **Q:** How do you recognize it?

[17]    **A:** It has his name on the card and my initials are on the

[18] back.

[19]    **Q:** Is it in substantially the same condition as it was when

[20] you received it?

[21]    **A:** Yes, it is.

[22]    **MS. GOLDBERG:** The government offers Government

[23] Exhibit 120.

[24]    **MR. SPORN:** Can we have a minute to look at that, your

[25] Honor?

**Page 103**

[1]    **THE COURT:** Quickly.

[2]    **MR. BUCHWALD:** Your Honor, I am going to have a

[3] technical objection because this is all hearsay, this point. I

[4] understand there may be subsequent connection, but we need to

[5] know when these were seized and how they were seized.

[6]    **THE COURT:** Your objection is noted.

[7]    Ms. Goldberg, are we almost finished? I would like to

[8] do it before the lunch break.

[9]    **MS. GOLDBERG:** We will, your Honor.

[10]    **THE COURT:** Mr. Sporn.

[11]    **MR. SPORN:** Thank you, your Honor. I'm looking at two

[12] other documents that I think are going to be offered also.

[13]    I have no objection to 120.

[14]    **THE COURT:** I'll allow it. Go ahead.

[15]    (Government's Exhibit 120 received in evidence)

[16]    **Q:** That's the Colombian identification card for William Saenz

[17] Duque?

[18]    **A:** Yes, it is.

[19]    **Q:** Let me show you what's been marked for identification as

[20] Government Exhibit 121. Do you recognize that?

[21]    **A:** Yes, I do.

[22]    **Q:** What is it?

[23]    **A:** It's a business card that was in the personal belongings of

[24] William Saenz Duque when it was turned over to me.

[25]    **Q:** How do you recognize it?

Page 204

[1]  UNITED STATES DISTRICT COURT

1  SOUTHERN DISTRICT OF NEW YORK

[2]

2

[3]  UNITED STATES OF AMERICA,

3

[4]        v.        02 Cr. 1290 (RMB)

4

[5]  HECTOR RUIZ

5  WILLIAM DUQUE

[6]  JAMES DUQUE,

6

[7]        Defendants.

7

[8]

8

[9]        New York, N.Y.

9        June 12, 2003

[10]        8:45 a.m.

10

[11]

11  Before:

[12]

12        HON. RICHARD M. BERMAN,

[13]

13        District Judge

[14]

14

[15]        APPEARANCES

15

[16]  JAMES B. COMEY

16    United States Attorney for the

[17]    Southern District of New York

17  MARC L. MUKASEY

[18]  LAUREN GOLDBERG

18    Assistant United States Attorneys

[19]

19  ALEX EISEMANN

[20]    Attorney for Defendant Hector Ruiz

20

[21]  MICHAEL H. SPORN

21    Attorney for Defendant William Duque

[22]

22  DON BUCHWALD

[23]    Attorney for Defendant James Duque

[24]

[25]  ALSO PRESENT: PAULA GOLD, Spanish Interpreter

25  DAGOBERTO ORRANTIA, Spanish Interpreter

---

Page 204

[1]  (Trial resumed)

[2]      (In open court; jury not present)

[3]      THE COURT: Does anybody want to be heard on any of

[4]  the issues that you raised either in letters, incidentally, we

[5]  have a revised copy of the government's letter this morning

[6]  which had been missing page 2 and it was helpful because page

[7]  2, you will forgive me, had more substance in it than page 1.

[8]  I was very glad to get page 2. It raises more issues. I will

[9]  say more about that in a minute. Does anybody want to be

[10]  heard.

[11]      MR. EISEMANN: Yes, I will take the letter in order.

[12]  The hearsay issue I will let other people talk about. With

[13]  respect to the purity of the heroin, I am willing to stipulate

[14]  that the purity of the heroin in this trial is not material,

[15]  and if that's the stipulation I am happy not to go into purity.

[16]  I think it may obviate the need to call the chemist.

[17]      THE COURT: I am not sure what you are each trying to

[18]  prove. It will be the first time in a long time we needed to

[19]  have one or more chemists in a case like this. Talk to

[20]  Mr. Mukasey, or have you.

[21]      MR. EISEMANN: I have. His letter seems to indicate

[22]  the purity is not material. If the government can give its

[23]  position, it may resolve it now, otherwise —

[24]      MR. MUKASEY: We took this right out of the law, right

[25]  from your Honor's charge.

Page 205

[1]      THE COURT: Do we need the chemists, can we do

[2]  whatever is seeking to be done by stipulation.

[3]      MR. EISEMANN: If we could have a testimonial

[4]  stipulation by the government chemist as to weight, how he

[5]  basically got there. What he did is what he did. I would like

[6]  that and decide if I would need to bring in a chemist to talk

[7]  about the process, whether it was a fair process, then nobody

[8]  would talk about purity.

[9]      MR. MUKASEY: Does anybody else need a chemist on

[10]  purity.

[11]      (Pause)

[12]      MR. EISEMANN: Your Honor, I think, I know we have all

[13]  agreed that the way it would work, the government would not

[14]  have to call their own chemist. We talked about what a

[15]  testimonial stipulation from the government's chemist would be.

[16]  We may, depending on if we decide to call our own chemist to

[17]  talk about whether the government's determination of weight

[18]  which the chemist did is really a representative way to

[19]  determine the overall weight of the heroin in the suitcase.

[20]  The chemist did what he did. The question is whether that is a

[21]  fair way to do it, to extrapolate, take a sample. If that's

[22]  not acceptable, we won't call our chemist.

[23]      THE COURT: You can decide.

[24]      MR. MUKASEY: I don't think that's of much

[25]  consequence, only because if we sign the stipulation and

---

then —

THE COURT: They get the witness.

MR. MUKASEY: — then they get the witness, we have to call someone on rebuttal to explain why his guy is wrong.

THE COURT: Anything else.

MR. EISEMANN: My complaint, other people have issues, the complaint is offered to impeach the agent's testimony because he says agent told me so-and-so on the street, I am paraphrasing, and in fact no agent did tell him that. That was my argument. This goes to his whether he is credible based on his recollection. I don't care about the truth of the matter of the complaint. I am not offering it for the truth of the matters asserted. I am offering it to show inconsistency.

MR. MUKASEY: If that's true he ought to redact the entire complaint except the sentence he wants to impeach the agent with.

MR. EISEMANN: OK, so long as it's in context, it's not out of context. I am not trying to slip anything in; I will do that.

THE COURT: I might as well say it here. In my view the principal reason this case is going as slowly as it is is because there is a lot of bickering, not bickering, that's probably the wrong word, a lot of disagreement on issues that I might say could have been resolved beforehand and are not and are brought up as we go along. I think that is what is

---

principally is slowing things down. If that's the way it has to be, that's the way it has to be. You had probably better clear your calendars for the next week, perhaps the week after. This is not going on a very speedy track. So, that's another story. So, anything else.

MR. SPORN: Your Honor, just with regard to the government's letter, the first paragraph.

THE COURT: This is my problem. Everybody is taking a shot. You don't talk among yourselves. There is no disagreement. Now you are going pack to paragraph 1, hearsay.

MR. EISEMANN: I didn't talk about that.

THE COURT: I understand that. It would be so much easier if one of you, if you had met and conferred, and one of you stood up and said these are our problems with the letter. Now I have the three of you standing and this is what's slowing things down. You are not coordinating, you are not precise, you are not that clear, both in the direct and cross, and it comes across. That is why at the end of the day yesterday we had done one witness on the first day, why it took me longer than ever to pick a jury because this is what has characterized this trial. That's what it is.

MR. SPORN: Your Honor, I have to say, we got this letter this morning, and your Honor is on the bench moving us along. We have had not had a chance to discuss. You asked us to have a coordinated approach.

---

[1]    THE COURT: What do you want to say, you want to talk
[2] about the rulings on hearsay.
[3]    MR. SPORN: It's more of an issue for Mr. Buchwald.
[4]    THE COURT: Then why are you talking about it.
[5]    MR. SPORN: Because I thought we would both have an
[6] opportunity to say something.
[7]    THE COURT: If it's his issue what do you want to say.
[8]    MR. SPORN: It's a two-sided thing. The point here, a
[9] very discrete point I want to make, the agent's reports are all
[10] about not what he says but what another witness says.
[11]    THE COURT: I got it.
[12]    MR. BUCHWALD: Your Honor, first, preliminarily, we
[13] represent the three separate clients.
[14]    THE COURT: I understand that, Mr. Buchwald. Look, I
[15] don't need lecturing. I don't need condescension. If you
[16] think that I don't know that you represent three separate
[17] defendants, hold on a second, because that is a problem here.
[18] Let's just take the points. Number 1, let's talk about the
[19] hearsay for the moment. You know, I am certainly not an expert
[20] on hearsay, but I will eventually guess that I have done more
[21] criminal trials than all of you put together if you count
[22] Family Court and here, probably 150, 200, probably more than
[23] that with hearings, 300, 400, something like that. I am no
[24] expert. I am certainly no expert.
[25]    The lawyers who have been the most successful for me,



---

[1] I say this very sincerely in an effort to be helpful, are the
[2] lawyers who come to court and go with the flow. The judge may
[3] have it wrong, the judge may have the wrong perspective, may
[4] have a wrong legal ruling, but we are taught to go with the
[5] flow, so we work around it as lawyers. As lawyers we do the
[6] best we can. We don't focus on projecting on to the judge our
[7] problems in the trial, if that is what's going on. We as good
[8] lawyers work around the judge. We don't whine, as in the first
[9] paragraph, which is a little condescending I think. I know the
[10] rules of evidence as well as the authors of this letter. It's
[11] not particularly valuable.
[12]    The real bottom line, we all agree this information is
[13] going to come in from Mr. Diaz anyway. It's not in the least
[14] bit prejudicial. If you look at the transcript from yesterday,
[15] you will see that certainly not these questions are not what's
[16] slowing down this trial. The government had 2 hours on direct,
[17] cross was almost exactly 2 hours as well. What's slowing down
[18] the trial, the trial is a little bit labored in the
[19] presentation in both direct and cross. I say these things in
[20] efforts to be helpful and I don't, maybe it appears I do, I
[21] don't need the obvious, I don't need to hear from the
[22] government what hearsay is A, B, C, and I don't need to hear
[23] from the defense there are three defendants and each defendant
[24] has a different interest and perspective.
[25]    If you don't think I know that, well, if I don't know

---

 **Min-U-Script®**    **SOUTHERN DISTRICT REPORTERS, P.C.**

Page 599

[1]  MR. EISEMANN: We've agreed that you won't say, Oh,
[2]  they are exact. It's not in the stip because —
[3]  MR. MUKASEY: I'm going to say the chemist would have
[4]  testified as in the stip, and you can say what you want to say
[5]  about generalized —
[6]  MR. EISEMANN: We'll have to discuss this further.
[7]  THE COURT: I think we're ready.
[8]  MR. BUCHWALD: With respect to the order of things,
[9]  the first thing?
[10]  THE COURT: Wait a minute, Andrew.
[11]  MR. BUCHWALD: The order of things on the defense
[12]  case. I assume there'll still be a five-minute break. There's
[13]  one little stipulation —
[14]  MR. SPORN: Your Honor —
[15]  THE COURT: One at a time.
[16]  MR. SPORN: This has to do with what he's saying.
[17]  There were some things taken from my client, and apparently the
[18]  originals are missing. So — but we've agreed — the
[19]  government was — gave me clean copies of both, which we will
[20]  agree all parties are —
[21]  THE COURT: Copies of the original.
[22]  MR. SPORN: Certified copies of the originals. And
[23]  since Mr. Buchwald is putting on his case first, he wants to
[24]  use them, so I think he wants to give you a heads-up that we
[25]  have that stipulation.

Page 600

[1]  THE COURT: That's fine. Okay. Let's go.
[2]  (Continued on next page)
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 601

[1]  (In open court)
[2]  THE COURT: First of all, thanks for your flexibility
[3]  in taking an early lunch. It helps in the administration of
[4]  the case and moving things along.
[5]  Second, we're making good progress, as you will see
[6]  soon.
[7]  And third, just for a scheduling note, tomorrow, there
[8]  will be no trial till 1:00 o'clock. So you have the morning
[9]  off tomorrow. And we'll start at 1:00. If you could assemble
[10]  about, say, five to 1:00. You take care, have lunch on your
[11]  own, and we'll get something for a break around 3:30 or so, you
[12]  know, a snack of some kind.
[13]  So — good. All right. We will continue then with
[14]  the government's direct case.
[15]  MS. GOLDBERG: Your Honor, at this time the government
[16]  would like permission to read portions of the guilty plea
[17]  allocutions of Hector Carvajal.
[18]  THE COURT: Okay. And once that's done, I will give
[19]  the jury an instruction as to how you can treat this. So
[20]  presumably you will tell us when, where and what was said.
[21]  MS. GOLDBERG: "On March 3rd, 2003, United States
[22]  District Court for the Southern District of New York, in this
[23]  courtroom before the Honorable Richard Berman, Hector Carvajal
[24]  pled guilty to narcotics charges. During his guilty plea
[25]  allocution he was asked the following questions by the Court,

Page 602

[1]  and gave the following answers:
[2]  "The Court: Mr. Carvajal, you understand that now
[3]  that you are under oath, that you realize that your answers to
[4]  my questions must be truthful and would be subject to the
[5]  criminal penalties of perjury or of making a false statement if
[6]  you did not answer truthfully? Do you realize that?
[7]  "Mr. Carvajal: Yes, your Honor.
[8]  "The Court: Mr. Carvajal, do you wish at this time to
[9]  plead guilty or not guilty?
[10]  "Mr. Carvajal: Guilty.
[11]  "The Court: Now, I'm going to ask you to please tell
[12]  me in your own words what it is that you did that makes you
[13]  believe that you are guilty of a conspiracy to distribute and
[14]  to possess with the intent of distributing at least three
[15]  kilograms but not more than 10 kilograms of heroin?
[16]  "Mr. Carvajal: I made arrangements to have that
[17]  picked up.
[18]  "The Court: You have to explain it to me in a little
[19]  more detail.
[20]  "Mr. Carvajal: How should I —
[21]  "The Court: First of all, who did you make these
[22]  arrangements with?
[23]  "Mr. Carvajal: This lady who had me making all the
[24]  arrangements.
[25]  "The Court: Did you have an agreement or an

Page 603

understanding with her?

"Mr. Carvajal: Yes, Sir.

"The Court: What was it to do? What was the agreement to do, what you and she agreed would happen?

"Mr. Carvajal: I was supposed to speak to someone to make sure the heroin got picked up, and when it got here, to see that it was delivered to her.

"The Court: When was this?

"Mr. Carvajal: Well, it was August.

"The Court: Was it supposed to come from Aruba to New York?

"Mr. Carvajal: Yes, Sir.

"The Court: What was it supposed to be?

"Mr. Carvajal: I was told that it was going to be that, heroin.

"The Court: How much heroin?

"Mr. Carvajal: Well, I was told that each person would have like a kilo or slightly more than — more than that. I was expecting in the end more than three kilos.

"The Court: And did you know that that agreement that you made with this lady and whoever else was illegal?

"Mr. Carvajal: Yes, Sir.

"The Court: Of what rear?

"Mr. Carvajal: Last year.

"The Court: What about the pickup? When did that

Page 604

happen?

"Mr. Carvajal: When I was picked up, it was like the 15th or the 16th that I was picked up.

"The Court: Of what month?

"Mr. Carvajal: September.

"The Court: Also last year?

"Mr. Carvajal: Yes, Sir.

"The Court: It's the same question. Are you pleading guilty to this conspiracy because you are guilty of this conspiracy?

"Mr. Carvajal: Yes, Sir. Because I did it. I can't say I didn't."

THE COURT: Okay, now, here is the instruction, and I'll say this again later in the final instructions:

You have just heard that Hector Carvajal pled guilty and made statements about his participation in a certain crime. You may consider these statements as evidence of the activities of the person who made the statements, and that is relevant to the case. You may consider these statements as evidence and, like any other evidence in the case, give these statements such weight as you believe appropriate. Please understand, though, that you may only consider these statements on the following issues:

One, whether there was a conspiracy to distribute and possession with the intent to distribute heroin as charged in

Page 605

[1] Count 1 of the indictment;

[2] And, Two, what, if anything, Hector Carvajal did in

[3] order to further the object of that conspiracy.

[4]     The question of whether the defendants in this case,

[5] three defendants in this case, were also members of that

[6] conspiracy alleged in Count 1 of the indictment is an issue for

[7] which you will have to rely on other evidence. There's no

[8] evidence in these statements naming the defendants on trial

[9] here. If you find, based in part on these statements, that the

[10] conspiracy charged in Count 1 of the indictment existed, you

[11] must assign as a separate question whether the defendants on

[12] trial here were a part of the alleged conspiracy based entirely

[13] on the other evidence presented in the case. There is nothing

[14] in these statements that answers that question one way or the

[15] other.

[16]     MS. GOLDBERG: Your Honor, the government will mark

[17] the portions of the plea allocution which were just read as

[18] Government Exhibit 200, and we'd offer that in evidence now.

[19]     THE COURT: Any objection? I'll allow it, hearing

[20] none.

[21]     (Government's Exhibit 200 received in evidence)

[22]     MR. EISEMANN: What was the number?

[23]     MR. BUCHWALD: 200.

[24]     MR. MUKASEY: Your Honor, may we read one more

[25] stipulation to the jury?

Page 606

[1]     THE COURT: Sure.

[2]     MR. MUKASEY: This is Government Exhibit 404. This is

[3] another stipulation between us, the government and all three

[4] defendants, with the consent of their lawyers.

[5]     "If called as a witness, Noel Vadell would testify as

[6] follows:

[7]     "He's employed as a forensic chemist at the Northeast

[8] Regional Laboratory of the U.S. Drug Enforcement Administration

[9] and he has been so employed for six years. His

[10] responsibilities as a forensic chemist consist primarily of

[11] testing different items for the presence or nonpresence of

[12] controlled substances. And he has performed such tests

[13] thousands of times in his career.

[14]     "On September 23rd, 2002, he received for examination

[15] and analysis Government Exhibit 500, a suitcase that's blue

[16] with a D-i-n-g-x-i-n label which had been removed from a secure

[17] DEA evidence vault where it had been stored since on or about

[18] September 16, 2002;

[19]     "After he received Government Exhibit 500, he opened

[20] it and performed two preliminary chemical tests on its black

[21] foam rubber interior lining to test for the presence of a

[22] controlled substance. Both tests yielded results consistent

[23] with the presence of heroin hydrochloride, commonly known as

[24] heroin.

[25]     "After his preliminary tests, he took apart Government



Page 607

[1] Exhibit 500 using a drill and removed the black foam rubber
[2] interior lining which is now contained in a plastic bag marked
[3] as Government Exhibit 501 from the body of the suitcase. He
[4] proceeded to weigh the black foam interior lining and obtained
[5] a weight of 4.364 kilograms, or 4,364 grams.
[6]    "To obtain a representative sample of this lining for
[7] use in further testing, he then cut approximately 12 pieces
[8] from different random areas of the black foam rubber lining,
[9] combined them together, and ground them up into a black
[10] grain-like substance that weighed about 26 grams. That sample
[11] is contained inside the small plastic bag within government
[12] Exhibit 501.
[13]    "Next, he took a portion of the sample and ran two
[14] confirmatory tests to test for the presence of heroin. Both
[15] tests confirmed the presence of heroin in the sample.
[16]    "He then performed gas chromatograph tests on a
[17] 211-milligram portion of this sample to determine how much
[18] heroin was present in the sample, and he determined that that
[19] portion, that 211-milligram portion of the sample, contained 25
[20] percent heroin.
[21]    "He then multiplied the percentage of the heroin
[22] present in the sample, the portion of the sample, which is 25
[23] percent, by the weight of the entire black foam lining inside
[24] Government Exhibit 501, and calculated that the black foam
[25] rubber interior lining inside G-501 contains 1.091 kilograms,

Page 608

[1] or 1,091 grams of heroin.
[2]    "When he finished testing the black foam rubber
[3] interior lining and this portion of the sample, he put them in
[4] a plastic bag and sealed the plastic bag, which is now
[5] Government Exhibit 501. He then placed Government Exhibit 501
[6] and Government Exhibit 500 in a DEA evidence vault, where they
[7] remained secure until they were removed and taken to a secure
[8] vault in the United States Attorney's office to be used at this
[9] trial."
[10]    May I pass this around to the jury?
[11]    THE COURT: Sure.
[12]    MR. MUKASEY: And I'll continue.
[13]    "On or about October 22, 2002, Mr. Vadell received for
[14] examination and analysis a paper wrapper, which contained
[15] tan-colored powder, and is now contained within Government
[16] Exhibit 135. The paper wrapper containing the tan powder had
[17] been removed from a secure DEA vault where it had been stored
[18] since on or about September 16, 2002. He removed the tan
[19] powder from the packaging, weighed it and determined that it
[20] weighed .44 grams. He then ran the same preliminary tests on
[21] the tan powder that are described earlier in this stipulation
[22] to test for the presence of a controlled substance. The tests
[23] yielded results consistent with the presence of heroin.
[24]    "He next performed two confirmatory tests on the tan
[25] powder to test for the presence of heroin. In each test, a

Page 609

[1] chemical analysis was performed to compare the tan powder in
[2] Government Exhibit 135 to known heroin samples. Both tests
[3] confirmed that the tan powder contained heroin.
[4]    "When he finished testing the tan powder, he placed it
[5] in a plastic bag, then sealed these items, along with the
[6] original paper wrapper, within the larger DEA evidence bag,
[7] which is Government Exhibit 135, and placed it in the DEA
[8] evidence vault where it remained secure until it was removed
[9] and taken to a secure vault in the United States Attorney's
[10] office for use at this trial.
[11]    "All the tests Mr. Vadell performed and methods he
[12] used were in accordance with standard DEA laboratory procedure.
[13]    "It is further stipulated and agreed by the government
[14] and the defense that Government Exhibits 500, 501 and 135 may
[15] be admitted in evidence at this trial. The government moves in
[16] 135, 500, 501 and this stipulation, which is marked as 404.
[17]    THE COURT: They are all admitted.
[18]    (Government's Exhibit 135, 404, 500, 501
[19] received in evidence)
[20]    MR. MUKASEY: May we have 30 seconds to confer?
[21]    THE COURT: Sure.
[22]    (Pause in proceedings)
[23]    MR. MUKASEY: Judge, we offered an exhibit which is on
[24] the screen now in front of you. I believe your Honor ruled
[25] that it was in subject to connection. I think that such

Page 610

[1] connection has now been made.
[2]    THE COURT: Exhibit 119?
[3]    MR. EISEMANN: I'd like to argue this. It doesn't
[4] have to be in front of the jury. It's already in subject to
[5] connection, but I'd like to take it up at the next break.
[6]    THE COURT: Okay. All right. Subject to that
[7] conversation —
[8]    MR. MUKASEY: Well, we continue to offer it, but give
[9] me five more seconds.
[10]    (Pause in proceedings)
[11]    MS. GOLDBERG: The government rests, your Honor.
[12]    THE COURT: Okay. That's the end of the government's
[13] direct case. We'll take a five-minute break, excuse the jury
[14] to the jury room for five minutes, talk to the lawyers, and
[15] then we'll proceed to Stage Two.
[16]    (Continued on next page)
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]



Page 611

[1]    (In open court; jury not present)

[2]    THE COURT: Quickly, Mr. Eisemann.

[3]    MR. EISEMANN: Your Honor, there has been no other

[4] connection between Government Exhibit 119 now than it was since

[5] it was originally offered. It's simply a list of names, none

[6] of which have been mentioned at this trial, and a list of

[7] numbers to which the government just has wild speculation that

[8] it's drug amounts. I think it's confusing; I think it's

[9] prejudicial, because there's nothing to connect it. And I

[10] therefore move to strike it.

[11]    THE COURT: Mr. Mukasey?

[12]    MR. MUKASEY: Agent Galbadis testified, based on his

[13] training and experience, it was consistent with a drug ledger.

[14] A suitcase full of heroin was loaded — or what was purportedly

[15] a suitcase full of heroin was loaded into Hector Ruiz's car,

[16] and heroin found in the center console. It's not much of an

[17] inference to conclude that it would be relevant that he had a

[18] drug ledger.

[19]    THE COURT: We don't need to go back and forth.

[20]    MR. EISEMANN: But there's no numbers that match up,

[21] and at the time you said it was taken subject to connection.

[22] Agent Galbadis testified they were waiting for additional

[23] evidence, and nothing has come in.

[24]    MR. MUKASEY: Except heroin in his car.

[25]    THE COURT: I'll allow it. We'll admit it into

Page 612

[1] evidence. That's the end of the government's case. Who's up

[2] next?

[3]    (Government's Exhibit 119 received in evidence)

[4]    MR. BUCHWALD: We'll have the one stipulation.

[5]    THE COURT: To start.

[6]    MR. BUCHWALD: The two documents.

[7]    MR. MUKASEY: Which ones? We don't need a

[8] stipulation. We won't object.

[9]    MR. SPORN: I think the jury needs to be instructed

[10] the reason that they are copies and not originals is that the

[11] originals are not available.

[12]    MR. BUCHWALD: The government lost the originals.

[13]    THE COURT: They're coming in by stipulation or what?

[14]    MR. MUKASEY: If they offer them, we're not going to

[15] object. And if your Honor or Mr. Sporn wants to get from the

[16] witness that there are originals and these — the originals are

[17] not available so we're using the copies, nobody has a problem

[18] with that.

[19]    THE COURT: That's fine. And then a witness?

[20]    MR. BUCHWALD: Then we will call our first witness,

[21] Patricia Moreno.

[22]    THE COURT: Great.

[23]    MR. EISEMANN: With respect to Rule 29 motions, you

[24] want us to reserve them or make them now?

[25]    THE COURT: Put them on the record, sure.

Page 613

[1]    MR. EISEMANN: With respect to my client, I move for a

[2] dismissal of the indictment pursuant to Rule 29. Among other

[3] reasons, there is no evidence established beyond a reasonable

[4] doubt of my client's involvement. Your Honor has a list of the

[5] evidence. Unless you want me to marshal it for you, I think

[6] you're aware of the weakness of the government's case, and I

[7] move for a dismissal at this time.

[8]    MR. BUCHWALD: Your Honor, with respect to my client,

[9] James Duque, we move for the dismissal on both counts of the

[10] indictment. There has — on the grounds that reasonable jurors

[11] cannot conclude beyond a reasonable doubt on the basis of the

[12] evidence presented to date that he is guilty under Rule 29.

[13]    We would focus, if we might, your Honor's attention on

[14] my client with respect to Number 1, the issue of importation to

[15] the United States. I don't believe that there's any testimony

[16] concerning my client having knowledge of importation to the

[17] United States on the present record.

[18]    Furthermore, distribution within — distribution as to

[19] which there is venue that is within the United States and

[20] New York. Once again, I believe that there is no evidence of

[21] his knowing participation in such a conspiracy.

[22]    So I'd ask you to focus individually on each of the

[23] two counts, in particular the knowledge element with respect to

[24] the importation count as to my client.

[25]    MR. SPORN: As to William Duque, I also move for a

Page 614

[1] judgment acquittal after government's direct case pursuant to

[2] Rule 29. We're concerned solely with the issue whether the

[3] defendant knew that the heroin was to be trans-shipped to the

[4] United States, and on that point, which is an element that must

[5] be proven beyond a reasonable doubt, I don't think the

[6] government really has presented any evidence.

[7]    And with respect to the first count, also, I join with

[8] Mr. Buchwald. For my client's case, this is really an

[9] importation case and not a distribution case and there's no

[10] evidence he was involved in any distribution scheme.

[11]    THE COURT: Okay. My options on such a motion are to

[12] either grant it or deny it or reserve decision, as it were, and

[13] I'm going to do the latter and ask that the case go forward and

[14] be presented to the jury, and then we'll re-examine the motion

[15] if, as and when it becomes appropriate.

[16]    MR. SPORN: Thank you.

[17]    THE COURT: So we'll call the jury back and we'll

[18] proceed with the defense.

[19]    MR. BUCHWALD: If I can indicate for the interpreters

[20] our first witness will speak Spanish.

[21]    THE COURT: Just so counsel know for scheduling, at or

[22] about 2:00 I have a civil conference for which I will need the

[23] room very briefly, but — and I think — I'll leave it up to

[24] you what you'll do with your documents, etc. It's a Rule 16

[25] initial conference. This one may take a little longer — no

Page 663

[1]     (In open court)

[2]     THE COURT: I think we're finished with this witness.

[3] We're going to take a witness out of turn. Even though

[4] Mr. Buchwald still has more witnesses to call, Mr. Ruiz has a

[5] witness here today.

[6]     MR. EISEMANN: Mr. Ruiz calls Robert Whitford.

[7]     (Witness affirmed)

[8]     DEPUTY CLERK: Can you state your name, and spell your

[9] last name?

[10]     UNIDENTIFIED MAN: Robert Van Norman Whitford,

[11] W-h-i-t-f-o-r-d.

[12]     THE COURT: Counsel, let's move.

[13]     MR. MUKASEY: I didn't get any discovery on this

[14] witness. We're trying to hurry this along.

[15]     (Pause)

[16] ROBERT VAN NORMAN WHITFORD,

[17] called as a witness by the Defendant,

[18] having been duly sworn, testified as follows:

[19]             DIRECT EXAMINATION

[20]             BY MR. EISEMANN:

[21]     Q: Good afternoon, Mr. Whitford.

[22]     A: Good afternoon.

[23]     Q: What do you for a living?

[24]     A: I'm a court interpreter.

[25]     Q: Have you received any training. Withdrawn.

Page 664

[1]     In what language are you an interpreter?

[2]     A: In Spanish.

[3]     Q: Have you received any training or experience that qualifies

[4] you to interpret Spanish?

[5]     A: I have bachelors and masters degrees in Spanish. I had a

[6] year of study at the University of Madrid. I have been

[7] interpreting professionally since 1982, full-time.

[8]     Q: And are you certified to interpret through any official

[9] agency?

[10]     A: I am certified as a Court Interpreter for Spanish-English

[11] proceedings by the Administrative Office of the U.S. Courts in

[12] Washington; recognized as a Master Interpreter by the

[13] Administrative Office of the Courts in New Jersey; I am

[14] accredited as a translator in both Spanish-to-English and

[15] English-to-Spanish by the American Translators Association.

[16]     Q: And are you a member of any organizations?

[17]     A: I am a member of the National Association of Judiciary

[18] Interpreters and Translators.

[19]     Q: And have you ever lived abroad?

[20]     A: I have lived abroad in — I've lived in Mexico for a period

[21] of five months; in Spain for two years, two one-year segments.

[22] I have lived in Bolivia for two years.

[23]     Q: Have you also traveled to Spanish-speaking countries?

[24]     A: Yes, I have.

[25]     Q: Where have you traveled?

Page 665

[1]     A: Many parts of South America, Argentina, Paraguay, not to

[2] mention Bolivia. I go back to Spain as often as I can.

[3]     Q: Have you traveled to the Dominican Republic?

[4]     A: I have been to the Dominican Republic several times. I've

[5] been to Puerto Rico many, many times.

[6]     Q: And Peru?

[7]     A: Peru.

[8]     Q: Venezuela?

[9]     A: Peru, Venezuela.

[10]     Q: When you travel those countries, do you speak in Spanish?

[11]     A: Yes.

[12]     Q: And what year was it that you were certified through the

[13] Administrative Office of the United States Courts?

[14]     A: I believe it was 1981.

[15]     Q: And when did you become an accredited translator to the

[16] American Translator Association?

[17]     A: 1983.

[18]     Q: And what year were you accredited as a master interpreter

[19] through the State of New Jersey?

[20]     A: As soon as they began to recognize different levels of

[21] interpreting. I believe it was 1995.

[22]     Q: Have you provided interpretative services in Spanish in the

[23] United States District Courts or in the United States?

[24]     A: Indeed I have, in over 55 cities. In district courts from

[25] Billings, Montana; Biloxi, Mississippi; Atlanta, Boston, and in

Page 666

[1] between.

[2]     Q: When you do that — withdrawn.

[3]     What percent of those cases that you work in the

[4] United States District Courts are criminal cases?

[5]     A: Virtually all of them.

[6]     Q: And when you are interpreting in the courts, are you hired

[7] by the Court or by the defense or by the prosecution?

[8]     A: Working in court, most of my work is when I'm hired by the

[9] Court. Defense attorneys hire interpreters such as myself to

[10] visit clients and prepare for cases, and I've also worked for

[11] the United States Attorney's office here in the Southern

[12] District of New York, the Eastern District — Eastern District

[13] of — Eastern District of Pennsylvania, among others.

[14]     Q: And does your work for the U.S. Attorney's office involve

[15] the translation of Spanish language tapes?

[16]     A: It has, yes.

[17]     Q: Have you had a lot of experience, a little experience with

[18] that, with the U.S. Attorney's office?

[19]     A: I have done between 2- and 300 tapes over the years.

[20]     Q: Did you have occasion — I'm sorry, I need to ask the

[21] government something.

[22]     (Off the record discussion)

[23]             BY MR. EISEMANN:

[24]     Q: Are you familiar with an interpreter named Dina Millman?

[25]     A: Yes, I am.

Page 667

Q: And how do you know Ms. Millman?

A: I have known Dina Millman since I arrived in the New York area in 1984 and have worked with her over the years.

Q: Here in the Southern District of New York?

A: Here in the Southern District, yes.

Q: Did you have occasion at my request to review a tape in this matter which is identified as N-21 dated September 16th, 2002?

A: Provided that's the one. I don't know the number.

Q: Well —

THE COURT: Did you have a chance to review some tape?

THE WITNESS: Yes, I did.

Q: And that tape was provided by me to you?

A: Yes, it was.

Q: And did you also have an opportunity to review a document which has Government 113-TR on it?

A: Yes, I did.

Q: You know this document now?

A: I do (indicating).

Q: And you reviewed that while you were listening to the tape that I've identified as N-21?

A: Yes.

MR. EISEMANN: Your Honor, can I pass out copies of — it's been distributed already.

THE COURT: Yeah, sure.

Page 668

MR. EISEMANN: If everyone could turn to Page 6 of that transcript.

THE COURT: Do you have a copy?

THE WITNESS: I don't have a copy.

(Pause)

MR. EISEMANN: Your Honor has a copy?

THE COURT: I do.

BY MR. EISEMANN:

Q: Now, can you describe for the jury what you did to be able to listen to this tape? How did you do it?

A: I have a Marantz professional recorder, tape player, which permits me to speed up and slow down the volume.

Q: The speed?

A: The speed, yes. Not the volume. Of course, there's always a volume control. The speed as well. So that you can make it sound like the chipmunks or you can have it go very slow, to sometimes try and pick up — make a particular sound clearer. I listened to this tape, the whole tape, maybe 10 times. This particular paragraph, 20 to 30 times.

Q: And you listened to this particular paragraph on Page 6 beginning with the English translation: "Flash the lights for this guy," at my request, did you not?

A: I did.

Q: How many times did you listen to that particular paragraph, did you say?

Page 669

[1] A: 20 to 30 times.

[2] Q: When you listened to the paragraph, did you use the speed [3] control to slow it down?

[4] A: Yes, I did.

[5] Q: When you were listening to that, directing your attention [6] to the word "man" in italics on the Spanish side, did you have [7] occasion to listen to that word and see whether you heard the [8] word man or something else?

[9] A: I — what I heard was "van".

[10] Q: Can you just spell that for the reporter, make sure she [11] gets it?

[12] A: V-a-n.

[13] Q: As in an automobile van?

[14] A: As in a vehicle, yes.

[15] Q: And when you listened to the tape — again, directing your [16] attention to the Spanish side of this paragraph — after the [17] word man, it says, alli en el carro mio. Do you recall [18] listening to at least that portion of the conversation?

[19] A: Yes, I do.

[20] Q: Did you hear the word en, e-n, in that passage?

[21] A: I did not.

[22] Q: And what's your confidence level that the word en does not [23] appear at that point in the Spanish, based on your review of [24] the tape?

[25] A: My confidence level?

Page 670

[1] Q: Yes.

[2] MR. MUKASEY: Objection.

[3] THE COURT: I'll allow it.

[4] A: I listened many, many times. I did not hear it.

[5] Q: If you can bear with us non-Spanish speaking people and [6] give us a little bit of a lesson. In the Spanish, what does [7] the word pongale mean, at the beginning of that sentence?

[8] A: Well, it's from poner, p-o-n-e-r, which means "to put". [9] It's a very useful verb. It has many, many usages. To use [10] that with a table means to set the table, for example. To put, [11] place — any number of things. Turn on a light.

[12] Q: And that's how it's used in there?

[13] A: Turn on the radio. Well, turn it on or shine it or —

[14] Q: It can have many meanings with respect to the lights?

[15] A: Many meanings, yes.

[16] Q: Can you explain your — can you provide your translation [17] for pongale la luz a este, and then —

[18] A: The thing is that it goes — it's a continuum. There are [19] three dots there, but it — it's a continuum to — pongale la [20] luz a este, a este coso....

[21] If there were a big pause after the first este —

[22] THE COURT: I have a suggestion. Could you tell us [23] how your English translation would read, if it would read [24] differently, than the English translation that is there? Isn't [25] that where we're going?



Page 671

[1] MR. EISEMANN: That's a good question.

[2] THE WITNESS: As a preliminary —

[3] THE COURT: No, not a preliminary. Just if you think

[4] it would be different, how would it be different?

[5] THE WITNESS: I think it would be "Shine the light on

[6] this thing so that we can take a ride with this van, my car.

[7] Shine the light on this one."

[8] MR. MUKASEY: I'm sorry?

[9] BY MR. EISEMANN:

[10] Q: When you read that translation, why was it that you chose

[11] to translate a este, a este coso, as "this thing"?

[12] A: I saw the este as a demonstrative adjective, not as a

[13] demonstrative pronoun. In other words, este refers to coso in

[14] both.

[15] Q: What is coso?

[16] A: To this, this thing.

[17] Q: Is it fair to say you heard a este as being the beginning

[18] of a sentence, and then there's a pause, and then you get the

[19] rest of the sentence stated more fully?

[20] A: It's just a slight hesitation and a continuation. "This

[21] thing".

[22] Q: And when you translate this as "take a ride with this van

[23] there, my car" — is that your translation?

[24] A: Yes.

[25] Q: Do you disagree with the translation that Miss Millman

Page 672

[1] provided — and she's the one that did this transcript, you

[2] know that, don't you?

[3] A: Yes.

[4] Q: When she says, "so that we can take a ride around the block

[5] with that man over there in my car," why is it that you

[6] translate that differently?

[7] A: Number 1, I don't hear "man". I heard "van". Van, and

[8] the instantaneous correction, "my car".

[9] Q: So there was a pause after it says in that "van?" There's

[10] a pause and then it says "my car"?

[11] A: Not much of a pause.

[12] Q: Do you see anything in the — withdrawn.

[13] Is there anything in the Spanish language that

[14] translates to "around the block" in this excerpt?

[15] A: Well, la vuelta could be "a ride". I would translate it so

[16] that "we can take a ride".

[17] Q: Okay.

[18] MR. EISEMANN: Nothing further.

[19] THE COURT: Anything from the government?

[20] MR. MUKASEY: If I could just have one moment, Judge.

[21] (Pause)

CROSS EXAMINATION
BY MR. MUKASEY:

[24] Q: Mr. Whitford, could you tell me the last case that you

[25] worked on for — as an interpreter hired by the government in

Page 673

[1] the Southern District of New York?

[2] A: I don't believe I could, sitting here.

[3] Q: You can't remember?

[4] A: I don't remember.

[5] Q: Is it fair to say that you're hired far more often by the

[6] defense than you are by the government?

[7] A: Indeed.

[8] Q: After you found an alternative interpretation for this

[9] paragraph, did you call the U.S. Attorney's office and say,

[10] There's a drastic mistake in here?

[11] MR. EISEMANN: Objection.

[12] THE COURT: Overruled.

[13] A: No, I did not.

[14] Q: Did you call Ms. Millman and tell her that her version was

[15] wrong?

[16] MR. EISEMANN: This is silly. I object to this.

[17] THE COURT: Overruled.

[18] A: No.

[19] Q: Have you heard of a model of car called the Cherokee?

[20] A: I've — yes, of course.

[21] Q: That would be a Jeep Cherokee, right?

[22] A: I believe so, yes.

[23] Q: And a Cherokee, if you know, is a kind of Jeep, not a kind

[24] of van, right?

[25] A: That's correct.

Page 674

[1] Q: Now, if you look at this transcript, 113-TR, you'll see

[2] that the two speakers names are Jose Diaz and Hector Carvajal.

[3] Do you see that?

[4] A: Yes.

[5] Q: How many times in interpreting this paragraph did you speak

[6] with Jose Diaz to get his — the context he could provide?

[7] A: I did not speak to him.

[8] Q: How many times did you speak with Hector Carvajal?

[9] A: I did not speak with Hector Carvajal.

[10] Q: You would agree with me, though, that it's important in

[11] translating conversation — or interpreting, excuse me —

[12] conversation, if possible, to have access to the speakers so

[13] they can give you some of the context, yes or no?

[14] A: I agree with that.

[15] MR. MUKASEY: Nothing further.

[16] THE COURT: Anything else?

[17] MR. EISEMANN: Yes, your Honor.

[18] THE COURT: Oh.

REDIRECT EXAMINATION
BY MR. EISEMANN:

[21] Q: Mr. Whitford, as far as you know, is there any duty of an

[22] interpreter asked by the defense to be an expert witness to

[23] call the prosecution when they find an error in the

[24] prosecution's translation?

[25] A: No.

Page 675

Q: Is there any duty you know of, or ethical responsibility of an interpreter, to call a fellow interpreter and say, I think you made a mistake here?

A: Well, no.

Q: The word "van," you said that a Jeep Cherokee, in your belief, is not a van, correct?

A: That's correct.

Q: Have you used — have you heard the word "van" used in your experience as an interpreter of the Spanish language to refer to other types of automobiles besides vans?

A: Vans, like trucks — very useful word. Some people erroneously perhaps refer to a station wagon as a van in conversation.

Q: And lastly, if I told you that Jose Diaz was a cooperating witness with the government, would you think that there would have been any possibility for you to reach out to Jose Diaz and speak to him —

MR. MUKASEY: Objection.

Q: Mr. Mukasey, this is redirect — to speak to him about what he meant when he spoke on this tape?

MR. MUKASEY: Objection. Calls for speculation.

THE COURT: I'll allow it.

A: I wouldn't think so.

THE COURT: You said that was your last question.

MR. EISEMANN: It was a two-parter, though, Judge.

Page 676

THE COURT: The second part.

Q: The second part is, if a defendant has pled guilty and not yet been sentenced and you wanted to talk to them and it was not the client's —

THE COURT: We got it. It's sort of like the first part.

Q: You didn't have any chance to speak to Hector Carvajal, did you?

A: I did not have a chance to speak to him.

THE COURT: We'll excuse this witness. Who's the next witness?

MR. BUCHWALD: James Duque, your Honor.

THE COURT: Okay.

(Witness sworn)

DEPUTY CLERK: State your name; spell your last name for the record.

THE WITNESS: James Levan Duque.

DEPUTY CLERK: I'll remind the interpreter she is still under oath.

MR. MUKASEY: May I have a moment?

THE COURT: Yes.

MR. MUKASEY: Thank you, your Honor.

(Pause in proceedings)

Page 677

[1] JAMES LEVAN DUQUE,

[2] called as a witness by the Defendants,

[3] having been duly sworn, testified as follows:

[4]      DIRECT EXAMINATION

[5]      BY MR. BUCHWALD:

[6] Q: Sir, how old are you?

[7] A: I'm 40 years old.

[8] Q: What is your date of birth?

[9] A: May 22nd, of the year 1963.

[10] Q: Where were you born?

[11] A: In Colombia.

[12] Q: And of what country are you a citizen?

[13] A: Colombia.

[14] Q: How far did you go in school?

[15] A: Eighth grade.

[16] Q: What is your marital status?

[17] A: I am married, but I'm separated.

[18] Q: What is your wife's name?

[19] A: Gloria Londonio.

[20] Q: Do you have any children?

[21] A: Yes, sir.

[22] Q: What are their names and ages?

[23] A: I have a son, a boy, whose name is Johnny Alessandro. He

[24] turned 15 not long ago.

[25]      I have a daughter whose name is Juliana who just

Page 678

[1] turned 10 not long ago.

[2] Q: And do they live with you or their mother?

[3] A: With their mother.

[4] Q: Where were you living at the time of your arrest?

[5] A: In Aruba.

[6] Q: And with whom were you living at the time of your arrest —

[7] take a minute. Relax.

[8] A: With Patricia Moreno.

[9] Q: Have you ever — how long have you been living with

[10] Patricia Moreno?

[11] A: A bit longer than three years.

[12] Q: And would you describe to the ladies and gentlemen of the

[13] jury your relationship with Miss Moreno?

[14] A: Yes. I had a stable relationship, steady.

[15] Q: What were you doing for a living in Aruba at the time of

[16] your arrest?

[17] A: I was employed at an automotive dealership. I worked as a

[18] mechanic.

[19] Q: And what was the name of the dealership?

[20] A: Drive Motor.

[21] Q: How long were you employed there?

[22] A: I was there for almost four years.

[23] Q: When did you move to Aruba from Colombia?

[24] A: I went in April of the year '99.

[25] Q: And when did you start working at Drive Motors?




Page 804

[1] how they got — how William had known to go to Drive Motors?

[2]    MS. GOLDBERG: Objection.

[3]    THE COURT: Sustained.

[4]    Q: Do you recall, Officer Dirks, being told that William had

[5] learned from James' sister —

[6]    MS. GOLDBERG: Objection.

[7]    THE COURT: Sustained.

[8]    Q: — that James worked at Drive Motors?

[9]    MS. GOLDBERG: Objection.

[10]    THE COURT: Sustained. Is there anything else?

[11]    BY MR. BUCHWALD:

[12]    Q: Is it not a fact, sir, other than your report in which you

[13] wrote nothing about this telephone call —

[14]    THE COURT: Sustained. You have tried that three

[15] times now.

[16]    Q: Other than this report, are there any other notes that you

[17] took that we could see which reflect what James said in

[18] response to your question about how did William know —

[19]    THE COURT: He's asking are there any other notes that

[20] you took.

[21]    THE WITNESS: No, only these in the computer.

[22]    MR. BUCHWALD: One moment, your Honor.

[23]    (Pause in proceedings)

[24]    Q: Sir, did you interview William about his property?

[25]    MS. GOLDBERG: Objection.

Page 805

[1]    THE COURT: Overruled.

[2]    A: William?

[3]    Q: William.

[4]    A: No.

[5]    Q: Did you interview William following his arrest?

[6]    A: If I did a hearing of — for William?

[7]    Q: Yes, did you interview William on September 16th following

[8] Williams' arrest that morning?

[9]    A: Yes.

[10]    Q: Am I correct, sir, that William totally denied being

[11] anywhere near the Sonesta —

[12]    MS. GOLDBERG: Objection.

[13]    THE COURT: Sustained. Sustained.

[14]    MR. BUCHWALD: May I approach, your Honor?

[15]    THE COURT: No, Sir. Are you almost done?

[16]    BY MR. BUCHWALD:

[17]    Q: Am I correct that unlike William, James told you about the

[18] Sonesta —

[19]    MS. GOLDBERG: Objection.

[20]    Q: — told you about the —

[21]    THE COURT: Sustained. Sustained. Counsel, is that

[22] it?

[23]    MR. BUCHWALD: Yes, your Honor.

[24]    THE COURT: Anybody else?

[25]    MS. GOLDBERG: Nothing further.

Page 806

[1]    THE COURT: This officer is excused. We'll have the

[2] next witness. Thanks very much.

[3]    Is there another defense witness?

[4]    MR. BUCHWALD: If I may have a moment, your Honor.

[5] May I have the interpreter?

[6]    (Pause)

[7]    MR. BUCHWALD: We'll recall James Duque.

[8]    THE COURT: Not at this time. Is there another

[9] defense witness?

[10]    MR. SPORN: I'm sorry?

[11]    THE COURT: I'm asking if there's a defense witness.

[12] It's 4:30. We're in the middle of trial. I'm asking if there

[13] is another witness. Is the defense resting at this time?

[14]    MR. EISEMANN: No, your Honor. I have a video

[15] surveillance tape.

[16]    THE COURT: Hold on a second. Mr. Buchwald, you are

[17] up. Do you have another witness, apart from Mr. Duque?

[18]    MR. BUCHWALD: I do, your Honor. He's I believe on

[19] the fifth floor cafeteria. They went to get him.

[20]    THE COURT: What about you, Mr. Eisemann?

[21]    MR. EISEMANN: My witnesses are coming back in the

[22] morning.

[23]    THE COURT: You have no witnesses today?

[24]    MR. EISEMANN: No witnesses today.

[25]    THE COURT: Do you have a witness, Mr. Sporn?

Page 807

[1]    MR. SPORN: I have my client.

[2]    THE COURT: Is he going to testify?

[3]    MR. SPORN: Yes.

[4]    THE COURT: Well then, let's go.

[5]    MR. BUCHWALD: Just for the record, we believe in our

[6] case we should be able to call James now.

[7]    THE COURT: We'll have that discussion later.

[8]    (Witness sworn)

[9]    DEPUTY CLERK: Could you please state your full name

[10] for the record?

[11]    THE WITNESS: William Saenz Duque.

[12]    DEPUTY CLERK: Thank you. You may be seated.

[13] WILLIAM SAENZ DUQUE,

[14] called as a witness by the Defendants,

[15] having been duly sworn, testified as follows:

[16]    DIRECT EXAMINATION

[17]    BY MR. SPORN:

[18]    Q: Mr. Saenz Duque, how old are you?

[19]    A: I am 46 years old.

[20]    Q: And where were you born?

[21]    A: Cali, Colombia.

[22]    Q: Did you grow up in Cali?

[23]    A: Yes, sir.

[24]    Q: You have brothers and sisters?

[25]    A: Yes, sir.

Page 952

here it had been suggested that once arrested, he had a motive to fabricate. This was prior to the arrest.

And it seems to me on independent — we still maintain the position that we did, that it wasn't hearsay, or fell within the exceptions to the hearsay rule of Hillman 802.2 and 802.3, but we believe, in any event, it would fall within 801(d)(1)(B) as a prior consistent statement.

THE COURT: Whether you believe that or not, I have taken, in good faith — I just have to say that candidly, I found it somewhat of a sharp practice to seek — not seek relief from the ruling in advance of the time that you offered in, whatever the basis is. Even if I were —

MR. BUCHWALD: I think your point is well taken.

THE COURT: It seemed like a strange time for it to be offered.

MR. MUKASEY: If the Court was stunned, you can imagine how the government felt. I don't know as I stand here now what the basis was for bringing that ex parte to the Court. I'm not going to inquire, other than to just maybe imagine it had something to do with funds or getting people up here from Aruba or something.

But we would ask — I want to take a look at the Jansen testimony, but we would ask that portions of that be stricken including parts that are so patently wrong like the fact that James Duque is a religious man. I mean, that has no

Page 953

basis in a federal trial. Obviously the Court recognized it, based on your ruling right now. I think we would like to move —

THE COURT: Take a look, you'll see. It's another question about whether — you know, if you wish to pursue it. You take a look.

So we're going to bring the jury back.

MR. BUCHWALD: Your Honor, may Patricia Moreno and Mr. Jansen attend the trial now?

THE COURT: I have no problem with that. They're not going to be called as witnesses in the trial?

MR. BUCHWALD: When we rest now, it's subject to our application —

THE COURT: Yes. Just wait.

(Continued on next page)

Page 954

[1] (In open court; jury present)

[2] THE COURT: Please be seated. Mr. Sporn has rested;

[3] is that right?

[4] MR. SPORN: Yes, sir.

[5] THE COURT: Mr. Eisemann is up; is that right?

[6] MR. EISEMANN: That's right, your Honor. May I

[7] proceed?

[8] THE COURT: Sure.

[9] MR. EISEMANN: Defendant Hector Ruiz calls Corey

[10] Fitzgerald.

[11] (Witness sworn)

[12] DEPUTY CLERK: State your name for the record, and

[13] spell your last name, please.

[14] THE WITNESS: Corey Michael Fitzgerald,

[15] F-i-t-z-g-e-r-a-l-d.

[16] DEPUTY CLERK: You may be seated.

[17] THE WITNESS: Thank you.

[18] COREY MICHAEL FITZGERALD,

[19] called as a witness by the Defendants,

[20] having been duly sworn, testified as follows:

[21] DIRECT EXAMINATION

[22] BY MR. EISEMANN:

[23] Q: Good afternoon, Mr. Fitzgerald.

[24] A: Good afternoon.

[25] Q: Can you describe for the jury where you were born, where

Page 955

[1] you grew up?

[2] A: Brooklyn, New York, USA.

[3] Q: That was short. And do you know an individual named Hector

[4] Ruiz sitting at this table?

[5] A: Yes, I do, sir.

[6] Q: How do you know him?

[7] A: He is my wife's cousin.

[8] Q: And how long have you known him?

[9] A: Roughly, I'd say about three years.

[10] Q: And over the three-year period you're talking about, how

[11] often would you see him?

[12] A: It was basically about, I'd say, once, twice a month.

[13] After my baby was born, I'd say probably about three times a

[14] month.

[15] Q: When was your baby born?

[16] A: July.

[17] Q: Of what year?

[18] A: Of last year.

[19] Q: And did you ever have occasion to go to his house?

[20] A: Yes.

[21] Q: When would you go to his house?

[22] A: Mostly on weekends. He works during the week, gets home

[23] very tired. We would just go on the weekends; it was more

[24] convenient. Sometimes he would even work on the weekends.

[25] Maybe Sundays sometimes.





Page 956

[1]  Q: That he would work on the weekends?

[2]  A: Yes.

[3]  Q: Where was his house? Where was your house?

[4]  A: I live in Brooklyn; he lives in Carona, Queens.

[5]  Q: Did he sometimes come to your house as well?

[6]  A: Yes.

[7]  Q: For family activities?

[8]  A: Basically, yes.

[9]  Q: Who was he living with at his house?

[10]  A: His daughter.

[11]  Q: How old is his daughter?

[12]  A: Now, 12.

[13]  Q: Did you ever have occasion to stay overnight at his house?

[14]  A: Yes.

[15]  Q: Can you describe the times you stayed there?

[16]  A: One time — it was twice. Once we just stayed over because

[17]  we were gonna go have breakfast in the morning, and one time

[18]  was on a favor. He had to work on a Saturday and he couldn't

[19]  find a baby-sitter, so we stayed and did the favor.

[20]  Q: What type of work does Hector do?

[21]  A: He's a factory worker.

[22]  Q: At LI Industries?

[23]  A: Correct.

[24]  Q: I actually forgot ask: What do you for a living?

[25]  A: I'm a sales executive, Gillies Coffee Company.

Page 957

[1]  THE COURT: Spell that, please?

[2]  A: G-i-l-l-i-e-s.

[3]  Q: I'll give you some advice I normally take: Slow down a

[4]  little bit so the court reporter can take it down.

[5]  A: Okay.

[6]  Q: What territory do you cover on your job?

[7]  A: Brooklyn, Queens, Long Island, some parts of the city.

[8]  Basically all over.

[9]  Q: Do you have people working under you?

[10]  A: I'm the top one, basically. There's three salesmen. Three

[11]  sales executives.

[12]  Q: Now, the time — did you talk about staying overnight

[13]  because he was working?

[14]  A: Correct.

[15]  Q: Could you just explain why is it you stayed there, what was

[16]  the problem? Was there a problem?

[17]  A: He couldn't find a baby-sitter for the Saturday and so we

[18]  did a favor.

[19]  MS. GOLDBERG: Objection. Relevance.

[20]  THE COURT: I'll allow it.

[21]  Q: So we stayed over to watch his daughter, otherwise — who

[22]  otherwise would have been alone.

[23]  Q: He raises his daughter by himself?

[24]  A: Correct.

[25]  MS. GOLDBERG: Objection.

Page 958

[1]  Q: Just so the jury can get a little feel for him as a person,

[2]  can you just describe what you have observed in the nature of

[3]  Mr. Ruiz's relationship with his own daughter?

[4]  MS. GOLDBERG: Objection.

[5]  THE COURT: I'll allow it.

[6]  A: Very, very close and loving relationship. Perfect example

[7]  of a father and daughter relationship.

[8]  Q: Does he cook meals for her?

[9]  A: Cooks, shops, provides, goes out. Basically everything.

[10]  He is the mother and the father.

[11]  Q: How would you describe his own personality, Hector?

[12]  A: Quiet. Quiet, very to himself kind of person.

[13]  Q: Nice person?

[14]  A: Yes, very.

[15]  Q: Good disposition, bad disposition?

[16]  A: Good disposition.

[17]  Q: Would you say he's a generous person?

[18]  A: To the extent that he can do, yes.

[19]  Q: What do you mean by the extent that he can do?

[20]  MS. GOLDBERG: Objection, your Honor.

[21]  THE COURT: Overruled.

[22]  A: Mr. Ruiz is not a man of many luxuries, but if you were to

[23]  go to his house — I mean, if he has half a bottle of milk,

[24]  half a bottle of milk will be offered to you first.

[25]  Q: Are you familiar with the automobile that he drove until it

Page 959

[1]  was seized in this case?

[2]  A: Correct, yes.

[3]  Q: What kind of automobile was that?

[4]  A: I believe it's a Jeep Grand Cherokee, Laredo, or something.

[5]  Q: Do you know what color it is?

[6]  A: I think it's black.

[7]  Q: Does gray jog your memory?

[8]  A: It was a dark color.

[9]  Q: Or tan? A dark color?

[10]  A: It was a dark color.

[11]  THE COURT: We'll move along.

[12]  Q: And how did he obtain that car?

[13]  A: That was purchased from the owner of his company, and he

[14]  was paying monthly payments on it to his boss.

[15]  Q: In all the time that you knew — that you've known

[16]  Mr. Ruiz, has he ever talked about drug dealing with you?

[17]  A: No.

[18]  Q: Have you ever seen him do anything that suggested he was

[19]  involved in drug dealing?

[20]  A: Not at all.

[21]  Q: Do you have an opinion as to whether he's the type of

[22]  person who would be involved in drug dealing?

[23]  MS. GOLDBERG: Objection.

[24]  THE COURT: Sustained.

[25]  Q: Based on your knowledge of him and his reputation in the

---

Page 960

community, would you say that he is the type of person who would be involved in drug dealing?

MS. GOLDBERG: Objection.

THE COURT: Sustained.

Q: Do you have an opinion as to his reputation for honesty and integrity in the community?

A: Yes, I do. It's very high. He's a very reputable person. Very well liked amongst many people. And I wouldn't — personally, I don't believe he would have the guts to do something like this.

MR. EISEMANN: No further questions.

### CROSS EXAMINATION
### BY MS. GOLDBERG:

Q: Mr. Fitzgerald, I believe you said that you see the defendant on an average of a couple of times a month?

A: Correct.

Q: And do you know all of his friends?

A: I've seen them; I've shaken hands with them. But I don't know them on a personal basis, no.

Q: You're not with him 24 hours a day, are you?

A: No, I'm not.

Q: You just see him a couple of times. Do you socialize with him?

A: Yes, I do.

Q: Go out to bars or clubs?

---

Page 961

A: No, no.

Q: Do you know what he does in his free time when you're not with him, those other 27 days of the month?

A: I have a pretty good idea that he sleeps because he gets up pretty early in the morning for work.

Q: He goes to work early?

A: Yes.

Q: Do you know what time he goes to work?

A: I know he gets up about 4:00, 4:30 in the morning.

Q: And I believe you said he's a mother and father to his child?

A: Correct.

Q: He gets up that early because he goes to work, correct?

A: Correct.

Q: Mr. Fitzgerald, where were you at approximately midnight on September 16th, 2002?

A: Not with him.

Q: And are you aware that at approximately midnight on September 16th, he was driving on 108th Street and Carona Avenue?

A: I am now.

Q: You weren't at the time, on September 16th? You didn't know he was out in the middle of the night, did you?

A: No.

Q: You didn't know he was out in his Jeep Cherokee driving

---

Page 962

[1] around with Hector Carvajal?

[2]    MR. EISEMANN: Objection. Not in the evidence. Move

[3] to strike.

[4]    THE COURT: Overruled.

[5]    Q: Could I have the answer read back?

[6]    A: Could you repeat the question?

[7]    THE COURT: I don't think there was an answer. Can we

[8] have the question reread, or you could rephrase it or restate

[9] it?

[10]    Q: You didn't know that he was driving around the streets of

[11] Queens at midnight on September 16th, 2002?

[12]    A: No, I don't know what Hector does in his personal time.

[13]    MS. GOLDBERG: No further questions, your Honor.

[14]    THE COURT: Thanks very much.

[15]    THE WITNESS: Thank you.

[16]    THE COURT: Next witness.

[17]    MR. EISEMANN: I call Claudia Uribe.

[18]    (Witness sworn)

[19]    DEPUTY CLERK: Could you please state your full name

[20] for the record, and spell your last name?

[21]    THE WITNESS: Claudia Uribe. U-r-i-b-e.

[22]    DEPUTY CLERK: You may sit down.

[23]    THE WITNESS: Thank you.

[24]

[25] CLAUDIA URIBE,

---

Page 963

[1] called as a witness by the Defendants,

[2] having been duly sworn, testified as follows:

[3]    DIRECT EXAMINATION

[4]    BY MR. EISEMANN:

[5]    Q: Good afternoon, Claudia.

[6]    A: Good afternoon.

[7]    Q: You speak English, don't you?

[8]    A: Yes.

[9]    Q: But you just told me you're more comfortable with an

[10] interpreter, is that right?

[11]    A: Yes, in case I need it.

[12]    THE COURT: Let's do it in one or the other. We have

[13] the interpreter. Let's do it in Spanish.

[14]    MR. EISEMANN: I think she just wanted her to have on

[15] standby.

[16]    THE COURT: That's all right. I'd like to do it in

[17] one language or the other. You decide.

[18]    BY MR. EISEMANN:

[19]    Q: You can do it in English?

[20]    A: Okay.

[21]    Q: Where were you born and raised?

[22]    A: I was born in Colombia.

[23]    Q: When did you why to the United States?

[24]    A: 1993.

[25]    Q: And how old were you then?



---



Page 964

[1]  **A:** 13.

[2]  **Q:** And do you know the man named Hector Ruiz sitting at this
[3]  table?

[4]  **A:** Yes, I know him.

[5]  **Q:** How do you know him?

[6]  **A:** I know him by his cousin, Deliana.

[7]  **Q:** And is she here today as well?

[8]  **A:** Excuse me?

[9]  **Q:** She's with you out in the hallway?

[10] **A:** Yes.

[11] **Q:** And how long have you known Hector?

[12] **A:** Two years ago.

[13] **Q:** And over that two-year period, how often would you say you
[14] saw him?

[15] **A:** Once a month.

[16] **THE COURT:** Once a month.

[17] **THE WITNESS:** Yes.

[18] **Q:** Do you think you came to know his personality over that
[19] time you spent with him?

[20] **A:** Yes. I know he's a quiet person, but sometimes we used to
[21] talk.

[22] **Q:** You talked about personal things?

[23] **A:** Yes, we do.

[24] **Q:** Would you say he's a generous person?

[25] **A:** Yes, he is.

Page 965

[1]  **Q:** Can you give any examples about how he was generous with
[2]  his time or his — this is all subject to connection, your
[3]  Honor?

[4]  **MS. GOLDBERG:** Objection.

[5]  **THE COURT:** I'll allow it.

[6]  **A:** He's a generous person with — one day, I need to go and
[7]  buy a gift for her cousin. That was her baby shower.

[8]  **Q:** You wanted to buy a gift for a baby shower?

[9]  **A:** Yes, but I need a ride. So he just picked me up and we
[10] went to a store to get the present for her.

[11] **THE COURT:** You went where? Where did you go.

[12] **THE WITNESS:** To Babies Rose to buy the present.

[13] **Q:** Did he come from his house to pick you up?

[14] **MS. GOLDBERG:** Objection, your Honor. 609 does not
[15] allow this.

[16] **THE COURT:** Overruled. Overruled.

[17] **Q:** Did he come from his house to pick you up?

[18] **A:** No, that was after work.

[19] **Q:** He picked you up at work, or he came from his work?

[20] **A:** No, he picked me up, my house, after he finished working.

[21] **Q:** How long — do you know where his factory is?

[22] **A:** No, I know that he's working from Astoria, but —

[23] **Q:** How long does it take to drive from Astoria to your house?

[24] **A:** 30 minutes.

[25] **Q:** How long does it take to drive from your house to the place

Page 966

[1]  you went to go shop for the baby shower gift?

[2]  **A:** 10 minutes, without traffic.

[3]  **Q:** And who went on that trip to get the baby's gift? Who was
[4]  in the car?

[5]  **A:** Both of us.

[6]  **Q:** Just you and Hector?

[7]  **A:** Yes.

[8]  **Q:** And did you both buy gifts?

[9]  **A:** Yes. I bought mine and he bought his gift.

[10] **Q:** What did he buy?

[11] **A:** I don't remember the name, what he bought.

[12] **THE COURT:** Let's move on.

[13] **Q:** There is a relevance to it, your Honor.

[14] What did he buy?

[15] **A:** It was a pad — the stroller.

[16] **Q:** And what did you buy?

[17] **A:** The — I don't remember.

[18] **Q:** And over the time you have come to know him, have you
[19] formed an opinion about his reputation for honesty and
[20] truthfulness and integrity in the community?

[21] **A:** Can you repeat that, please?

[22] **Q:** That one might require the interpreter. I'll do the rest
[23] in Spanish, your Honor.

[24] Over the time that you have known him, have you formed
[25] an opinion about his reputation for honesty and integrity and

Page 967

[1]  truthfulness in the community?

[2]  **A:** Yes, he is a quiet person, as I said before, and he's a
[3]  very honest person.

[4]  **Q:** Is there anything he's ever said to you that would lead you
[5]  to believe he was involved in —

[6]  **MS. GOLDBERG:** Objection.

[7]  **THE COURT:** I'll allow it.

[8]  **Q:** It's the issue.

[9]  That would lead you to believe that he was involved —

[10] **THE COURT:** Could you start that question again?

[11] **Q:** Sure.

[12] Is there anything that he has ever said to you that
[13] would lead you to believe that he was involved in the
[14] importation of large amounts of heroin outside the United
[15] States?

[16] **MS. GOLDBERG:** Objection.

[17] **THE COURT:** Sustained.

[18] **Q:** Have you ever discussed drug dealing with Mr. Ruiz?

[19] **MS. GOLDBERG:** Objection.

[20] **THE COURT:** I'll allow it.

[21] **A:** No. No.

[22] **Q:** Have you ever seen him be involved in drug dealing?

[23] **A:** No.

[24] **Q:** Do you think he would be involved with that?

[25] **MS. GOLDBERG:** Objection.



Page 968

THE COURT: Sustained.

MR. EISEMANN: Nothing further.

THE COURT: Anything from the government?

MS. GOLDBERG: No questions, your Honor.

THE COURT: Thanks. Next witness.

MR. EISEMANN: I'm sorry, I forgot to cover one area.

THE COURT: Miss Uribe, could you come back for one moment?

BY MR. EISEMANN:

Q: You're still under oath. You understand that, right?

A: Okay.

Q: Are you working now?

A: Yes.

Q: Where do you work?

A: I working with a lawyer in — in real estate.

Q: Let's do this in Spanish now. Because I think it will be a little bit easier.

A: Okay.

Q: Tell me where you're working?

A: I work with an attorney.

Q: And what kind of an attorney?

A: Who does real estate.

Q: And what do you do for that attorney?

A: I'm his assistant.

Q: Have you ever worked in any kind of factory job?

Page 969

A: I worked at a seniors living home. Not a factory.

Q: Did you work with Hispanic people in that job?

A: Yes.

Q: Would you say that the majority of the workers in the job were Hispanic people?

A: Yes.

Q: Now, was there a practice that you came to know while working in this job about how Hispanic people pool their money at work?

MS. GOLDBERG: Objection.

THE COURT: Sustained.

MR. EISEMANN: I have to make an offer of proof as to why this is relevant. It's an exhibit the government has offered and I'm going to —

THE COURT: Sustained.

MR. EISEMANN: Sustained?

THE COURT: Yep.

BY MR. EISEMANN:

Q: Have you ever been involved in the pooling of money with other employees into a pot of money?

MS. GOLDBERG: Objection.

THE COURT: I'll allow it.

A: Yes.

Q: How did that work?

A: Well, you get maybe 10 people together —

Page 970

[1]     THE COURT: Sustained. I don't know where this is

[2] going. I think you should move along.

[3]     MR. EISEMANN: Your Honor, there's a supposed chit

[4] sheet —

[5]     THE COURT: I'd like to move along.

[6]     MR. EISEMANN: This is the relevant evidence.

[7]     THE COURT: Then it's sustained. If you can't move

[8] along, you're finished with the witness.

[9]     MR. EISEMANN: I'll make an offer of proof afterwards,

[10] then, your Honor.

[11]     I have no further questions.

[12]     THE COURT: Anything from the government?

[13]     MS. GOLDBERG: No, your Honor.

[14]     MR. EISEMANN: Mr. Ruiz calls Lilia Tavera.

[15]     INTERPRETER: The interpreter would like to know,

[16] Counsel, if this is going to be interpreted.

[17]     THE COURT: Counsel, is this going to be in English or

[18] Spanish?

[19]     MR. EISEMANN: Would you prefer to speak in Spanish or

[20] in English?

[21]     MS. TAVERA: Either way. English.

[22]     MR. EISEMANN: You're okay in English?

[23]     MS. TAVERA: Yes.

[24]     DEPUTY CLERK: Ma'am, if you could remain standing for

[25] a moment and raise your right hand, please?

Page 971

[1]     (Witness sworn)

[2]     DEPUTY CLERK: Could you state your name and spell

[3] your last name for the jury?

[4]     THE WITNESS: Lilia Tavera, T-a-v-e-r-a.

[5] LILIA TAVERA,

[6] called as a witness by the Defendants,

[7] having been duly sworn, testified as follows:

[8]                 DIRECT EXAMINATION

[9]             BY MR. EISEMANN:

[10]     Q: Good afternoon, Lilia.

[11]     A: Hello.

[12]     Q: Where were you born and where did you grow up?

[13]     A: In Colombia.

[14]     Q: And —

[15]     A: Bogota.

[16]     Q: And how old were you when you moved to the United States?

[17]     A: I was 13.

[18]     Q: And are you working now?

[19]     A: Yes.

[20]     Q: What do you do for a living?

[21]     A: I work in Castle Senior Living at Forest Hills.

[22]     THE COURT: Castle Senior Living?

[23]     A: Yes, that's the name of the place.

[24]     Q: What do you do at that place?

[25]     A: I'm a hostess. I'm in charge of the dining room.

Page 972

[1]    Q: It's basically a nursing home?

[2]    A: Yes.

[3]    Q: And do you know Hector Ruiz who is sitting at the table

[4] next to me?

[5]    A: Yes.

[6]    Q: How long have you known him?

[7]    A: More than a year.

[8]    Q: How did you meet him?

[9]    A: By his cousin, Deliana.

[10]    Q: That's a person here in the hallway with you today?

[11]    A: Yes.

[12]    Q: Over the last year, how many times would you say you saw

[13] Hector? The year, we're talking about?

[14]    A: Like four, five times.

[15]    Q: Over how long a period of time was that, how many months?

[16]    A: In — I saw him, most of the time I saw him last year in

[17] July, like in the summer.

[18]    Q: And where did you see him?

[19]    A: One time his house. The other time we went out with

[20] Deliana and Deliana's baby shower.

[21]    Q: And where was the baby shower held?

[22]    A: In Brooklyn. Near her house.

[23]    Q: At a restaurant or —

[24]    A: Yes, an Italian restaurant.

[25]    Q: Who was there besides you and Hector and Deliana?

Page 973

[1]    A: His daughter.

[2]    Q: His daughter?

[3]    A: Yes.

[4]    Q: How old was she then?

[5]    A: 11, I think.

[6]    Q: And during the time that you had known Hector, did you come

[7] to know his personality?

[8]    A: Yes.

[9]    Q: And how would you describe him as a person?

[10]    A: Good person with his daughter, and with everybody. He was

[11] like a nice person.

[12]    Q: What's he like with his daughter? Do you have any examples

[13] of his relationship with her?

[14]    A: Yes. That day on the baby shower, we were there, we were

[15] all getting the food, so his daughter ordered like a pasta, and

[16] she didn't like it. So he changed the plate, as many times as

[17] she wants to change.

[18]    Q: Was he angry at his daughter?

[19]    A: No.

[20]    Q: What was his mood about that?

[21]    A: Hmm?

[22]    Q: What was his mood like about that?

[23]    A: Like he was asking her what she likes and what she wants to

[24] eat.

[25]    Q: And were there any other occasions that you had a chance to

Page 974

[1] observe Hector's personality as to whether he is a nice person

[2] or an angry person?

[3]    A: Oh, we have a barbecue at his house and he was nice, he was

[4] friendly with everybody.

[5]    Q: Did he make all the food or serve all the food to everyone?

[6]    A: Part of it. We were like making the barbecue together.

[7]    Q: And did anything happen?

[8]    A: Yes, we — with my friend, we broke a table, accidentally,

[9] and I thought he would get mad, but he was like, Fine, like —

[10] he was laughing and everything.

[11]    Q: All right. Has he ever talked about dealing drugs with

[12] you?

[13]    A: No.

[14]    Q: Have you ever seen him do anything that would suggest to

[15] you that he was involved in importing large amounts of heroin

[16] outside the United States?

[17]    MS. GOLDBERG: Overruled.

[18]    A: No.

[19]    Q: Do you think he is a drug dealer?

[20]    MS. GOLDBERG: Objection.

[21]    MR. MUKASEY: Objection.

[22]    THE COURT: Sustained.

[23]    A: No.

[24]    THE COURT: The answer is stricken.

[25]    MR. EISEMANN: Nothing further.

Page 975

[1]    MS. GOLDBERG: No questions.

[2]    THE COURT: Thanks. The witness is excused. Any more

[3] witnesses?

[4]    MR. EISEMANN: Your Honor, I just did the same thing

[5] with this witness — I guess I'm precluded from talking about

[6] this area, so....

[7]    The defendant Ruiz calls Deliana — the defense calls

[8] Delania Fitzgerald.

[9]    (Witness sworn)

[10]    DEPUTY CLERK: Could you please state your full name

[11] for the record, and spell your first name?

[12]    THE WITNESS: My name? Okay. Deliana Fitzgerald,

[13] D-e-l-i-a-n-a.

[14]    DELIANA FITZGERALD,

[15] called as a witness by the Defendants,

[16] having been duly sworn, testified as follows:

[17]    DIRECT EXAMINATION

[18]    BY MR. EISEMANN:

[19]    Q: Good afternoon. Deliana, you speak some English, right?

[20]    A: A little bit (in English).

[21]    Q: But you're more comfortable talking in Spanish?

[22]    A: Yes.

[23]    Q: All right. Have you ever testified before in court?

[24]    A: No.

[25]    Q: How do you feel about being here today?

Page 976

A: Nervous.

Q: Do you know Hector Ruiz?

A: Yes.

Q: He's sitting here in the blue shirt, right?

A: Yes.

Q: What's your relationship with him?

A: We're cousins (in English).

Q: How old were you when you first met him, how long have you known him?

A: We growing up together (in English).

Q: If you can speak in Spanish —

THE COURT: It's confusing to go back and forth.

Q: I didn't hear the answer, Judge?

THE COURT: They grew up together.

A: We grew up together.

Q: How are you cousins, what's the relationship?

A: My mother is a sister of his mother.

Q: Now, you both grew up together in Colombia?

A: Yes.

Q: Did you both live in the same town?

A: Yes.

Q: And what town was that?

A: Pareja.

Q: And how would you describe your relationship to Hector in terms of being close or not close?

Page 977

A: Close.

Q: When did he leave Colombia to move to New York?

A: I think 10 years.

Q: Did you then move to New York after that?

A: A long time later.

Q: A couple of years later?

A: More, five or six.

Q: When you came here, did you come to New York when you first came to the United States?

A: Yes.

Q: Are you still scared about being on the stand right now?

A: No.

Q: When you first came to the United States, how long did you stay here?

A: Six months.

Q: And where did you live when you got to the United States during that six-month period?

A: Richmond Hill.

Q: And whose house were you living in?

A: In Hector's house.

Q: And who was living there with you and Hector during that six-month period?

A: Hector, his little girl and I.

Q: And how old was his little girl at that point?

A: Eight years old.

Page 978

[1]   Q: Where was the — was Hector ever married?

[2]   A: Yes, but the wife left him with the child.

[3]   Q: And that was in Colombia?

[4]   A: Yes.

[5]   Q: When you were living with Hector, who was raising his

[6]   daughter?

[7]   A: He was taking care of her.

[8]   Q: Did he have any help taking care of her at all?

[9]   A: Just me.

[10]  Q: And how would you describe his relationship with his

[11]  daughter?

[12]  A: He's a very good father. He's always looking out for her

[13]  and doing everything he can for her.

[14]  Q: Now, when you arrived in the United States, did you seek

[15]  work?

[16]  A: Yes.

[17]  Q: Did Hector help you in any way to try to find work?

[18]  A: Yes.

[19]  Q: I notice you've been saying yes or no. But I'm going to

[20]  ask you now to explain a little bit about what he did to help

[21]  you find work.

[22]  A: He, with friends of his, would help me to find work.

[23]  Q: What kind of places was he helping you to try to find work?

[24]  A: In Colombian bakeries.

[25]  Q: Did he actually find you a job?

Page 979

[1]   A: Yes.

[2]   Q: Now, did Hector ever have occasion to give you a ride in

[3]   his car?

[4]   A: Yes, because I did not know the area very well and he

[5]   always picked me up after work.

[6]   MR. MUKASEY: Move to strike.

[7]   THE COURT: I'll allow it. Are we about concluded for

[8]   the —

[9]   MR. EISEMANN: Unfortunately, we're not, your Honor.

[10]  I've taken probably five minutes with each witness.

[11]  THE COURT: We're being very cumulative now and not

[12]  covering any new ground that I can see. So I'd like you to

[13]  wrap it up.

[14]       BY MR. EISEMANN:

[15]  Q: When he drove you — what time are you supposed to be at

[16]  work in the morning?

[17]  A: I worked in the afternoon and he worked in the morning. He

[18]  always used to get up between 4:00 and 5:00 in the morning in

[19]  order to go to work.

[20]  Q: And did he ever drive you to work or did he just pick you

[21]  up from work?

[22]  A: He would pick me up from work.

[23]  Q: And how long a ride — I'm sorry, withdrawn.

[24]  He would come from his home because he would be home

[25]  and pick you up at your work, right?



Page 980

[1]　A: No, he would pick me up after I would leave work.

[2]　Q: And where was your work?

[3]　A: In Green Point, Queens.

[4]　Q: And when he picked you up and he took you home, where did

[5]　he bring you?

[6]　A: We would go to his house.

[7]　Q: And that's where you were staying, right?

[8]　A: Yes.

[9]　Q: And how long a ride was it from your house with him to

[10]　where you were working?

[11]　A: 45 minutes.

[12]　Q: You ended up going back to Colombia at some point because

[13]　you didn't want to overstay your visa, right?

[14]　A: Yes. I did not want to damage my visa. I always remain

[15]　the time I had been given.

[16]　Q: And you went back to Colombia and then you returned again

[17]　to the United States later on?

[18]　A: Yes.

[19]　Q: And where did you stay when you got back from Colombia?

[20]　A: For two or three months, I stayed — I lived with Hector,

[21]　and then after that, I got my own room.

[22]　Q: During that period of time, it was you, Hector and his

[23]　daughter only?

[24]　A: Yes.

[25]　Q: During the time that you were living with Hector, did he

Page 981

[1]　ever travel to Colombia?

[2]　A: On vacation, yes.

[3]　Q: And when he came back, did he bring anything back with him?

[4]　A: Underwear and pants to sell.

[5]　Q: What kind of pants?

[6]　A: Jeans.

[7]　Q: Did you actually see the jeans yourself?

[8]　A: Yes.

[9]　Q: And they were new blue jeans, right?

[10]　A: Yes.

[11]　Q: And during the time that you were living with Hector, did

[12]　he ever use his car to give people rides in return for payment?

[13]　MR. MUKASEY: Objection, your Honor.

[14]　THE COURT: I'll allow it.

[15]　A: I don't know.

[16]　Q: Well, did you tell me earlier that he used to drive people

[17]　to work?

[18]　MR. MUKASEY: Objection.

[19]　THE COURT: Sustained.

[20]　MR. EISEMANN: I'm trying to jog her recollection.

[21]　THE COURT: Sustained.

[22]　Q: Are you sure you don't know? If you take a moment, you

[23]　might be able to —

[24]　A: I didn't understand the question. I'm sorry.

[25]　Q: Okay. Do you know if Hector —

Page 982

[1]　THE COURT: Counsel, the witness has got to testify,

[2]　not the lawyer. Let's move on.

[3]　MR. EISEMANN: May I repeat the question?

[4]　THE COURT: Let's move on.

[5]　MR. EISEMANN: Can the question be read back?

[6]　THE COURT: Let's move on.

[7]　MR. EISEMANN: Your Honor —

[8]　THE COURT: Let's move on, Counsel.

[9]　MR. EISEMANN: May I have a sidebar, your Honor?

[10]　THE COURT: Nope.

[11]　　　　BY MR. EISEMANN:

[12]　Q: Do you know if Hector ever gave people rides for money?

[13]　THE COURT: There's an objection. I've sustained the

[14]　objection.

[15]　MR. EISEMANN: Your Honor, the witness says she did

[16]　not understand the question.

[17]　THE COURT: There's an objection. I sustained the

[18]　objection.

[19]　MR. EISEMANN: To the question itself? All right.

[20]　I'm sorry, I didn't understand that.

[21]　　　　BY MR. EISEMANN:

[22]　Q: Now, during the entire time that you were living with

[23]　Hector, did you ever see him do anything that would suggest to

[24]　you that he would be involved in the importation of large

[25]　amounts of narcotics?

Page 983

[1]　A: Never.

[2]　Q: Is there anything about his personality that would lead you

[3]　to believe that he would be involved in drug dealing?

[4]　MR. MUKASEY: Objection.

[5]　THE COURT: Overruled.

[6]　A: No, no. Never.

[7]　Q: Finally, is there anything about his personality, his

[8]　routine, that would make you think he was not involved in drug

[9]　dealing?

[10]　THE COURT: That — not?

[11]　Q: That would make you think he was not involved in drug

[12]　dealing?

[13]　MR. MUKASEY: Objection.

[14]　THE COURT: Sustained.

[15]　MR. EISEMANN: Nothing further.

[16]　THE COURT: Okay. Thanks.

[17]　MR. MUKASEY: One question.

[18]　　　　CROSS EXAMINATION

[19]　　　　BY MR. MUKASEY:

[20]　Q: Miss Fitzgerald, Hector Ruiz is definitely not a drug user,

[21]　right?

[22]　MR. EISEMANN: Objection.

[23]　THE COURT: Overruled.

[24]　MR. EISEMANN: Form of the question, your Honor.

[25]　THE COURT: Overruled.