### Page 984

A: As far as I know, he wouldn't be capable of doing it.
Q: Of using drugs, himself?
A: I don't think so, but I don't know what his personal things are, and he wouldn't tell me about his personal things because — his personal things.
MR. MUKASEY: Nothing further.
THE COURT: Okay. Thanks a lot.
MR. EISEMANN: If I could just have a minute in the hallway, I have three other witnesses. It will be pretty brief.
(Pause in proceedings)
MR. EISEMANN: I call John Carvajal.
(Witness sworn)
DEPUTY CLERK: Could you state your name, and spell your last name for the record?
THE WITNESS: John Carvajal, C-a-r-v-a-j-a-l.
JOHN CARVAJAL,
called as a witness by the Defendants,
having been duly sworn, testified as follows:
            DIRECT EXAMINATION
            BY MR. EISEMANN:
Q: Good afternoon, Mr. Carvajal. You told me before that you would rather have the Spanish interpreter?
A: Yes, yes.
Q: Okay. You speak English pretty well, don't you?

### Page 985

A: Yes.
Q: But you've never testified before.
A: That's right.
Q: Are you feeling nervous up there?
A: Not really (in English).
Q: Okay. If you're going to talk in Spanish, you'll have to do it in a formal way —
A: Okay (in English).
Q: Let me finish —
THE COURT: Can we get to the questions?
MR. EISEMANN: Sure, your Honor.
Q: Where were you born?
A: In Colombia.
Q: And when did you come to the United States?
A: In 1987.
Q: And do you know a man named Hector Ruiz?
A: Yes, I know him well.
Q: Do you see him sitting here in the courtroom?
A: Yes.
Q: Are you related to a man named Hector Carvajal?
A: No, not at all.
Q: How do you know Hector Ruiz?
A: I know him from the town where we grew up. Our families always had stores. One was next to the other, basically. And so we basically grew up together.

### Page 986

[1] Q: And who came to the United States first between the two of
[2] you?
[3] A: I came first.
[4] Q: How many years later did Hector follow you?
[5] A: About five years later.
[6] Q: And when he came here, did he look you up?
[7] A: Yes, yes. Yes.
[8] Q: Were you working at the time?
[9] A: Yes, I was working for the same company I work for today.
[10] Q: And what's the name of that company?
[11] A: LIF Industries.
[12] Q: And what does that stand for, LIF?
[13] A: I would have to say that in English because I wouldn't know
[14] otherwise.
[15] Q: Go ahead.
[16] A: Long Island Fireproof Door.
[17] Q: Long Island Fireproof Door?
[18] A: Yes.
[19] Q: And what does that company make?
[20] A: We make doors and metal frames.
[21] Q: What's your position at the company?
[22] A: I am the supervisor of the shipping and receiving
[23] department.
[24] Q: And did Hector have a job there as well?
[25] A: Yes.

### Page 987

[1] Q: What was his job?
[2] A: He was basically my department's right hand.
[3] Q: What kind of worker was Hector at the job, or is he?
[4] A: He would basically know the same thing I know. Which was
[5] to drive the forklift, load the trucks. We did deliveries that
[6] were going to leave. And the only difference between the two
[7] of us is that I speak English 90 percent.
[8] Q: And what kind of worker was he in terms of his abilities
[9] and his reputation at work?
[10] A: Oh, my God, I think he was a hundred percent. He's the
[11] kind of guy that — we live in an apartment, one next to the
[12] other. Since I'm in charge of the shipping and receiving area
[13] of the factory, when we had to go to work at 3:00 a.m., I'd
[14] ring his doorbell and knock on his door or let him know the
[15] night before so he'd get up with me. We'd come back home at
[16] 8:00, 9:00, even 10:00 o'clock sometimes.
[17]     And I think you could look at the pay stubs to prove
[18] what I'm saying, for proof of what I'm saying.
[19]     (Continued on next page)

Page 988

[1] Q: Well, he worked there for how long a period of time? When
[2] did he start working there?
[3] A: He started working there I believe in '94. He worked there
[4] until 2000, basically until what happened to him.
[5] Q: During the time that you were working with him, did you
[6] ever have occasion to borrow money or lend money to him?
[7] Sorry, let me repeat the question; I didn't ask it properly.
[8] During the time that you were working with him, did you have
[9] occasion to loan money to him or borrow money from him?
[10] MS. GOLDBERG: Objection.
[11] THE COURT: Overruled.
[12] A: We had a very good relationship as friends; we were almost
[13] like brothers. We had in fact two kids the same age and many
[14] things were similar between us. So sometimes he needed money.
[15] His mother lives in Colombia. You know, things in Colombia are
[16] not so good; people need things sometimes. Other times he
[17] would loan me money.
[18] THE COURT: Did you ever lend him money or borrow
[19] money from him?
[20] THE WITNESS: Yes, yes.
[21] Q: What's your full name by the way?
[22] A: OK. My full name is John Favio Carvajal.
[23] Q: Around the time that Mr. Ruiz was arrested back in
[24] September of last year, did you owe him any money?
[25] A: Yes, I did owe him some.

Page 989

[1] Q: How much did you owe him?
[2] A: I owed him about $700, which he had lent me for rent a few
[3] months before because I had paid for plane tickets for my
[4] parents to come for vacation, so I was short Money-wise, so I
[5] asked him to loan me some money for the rent as a favor, and he
[6] did.
[7] Q: In the past had you loaned him money?
[8] A: Yes, there were times, yes.
[9] Q: What's the most you ever loaned him?
[10] A: I think one time I loaned him about $400 to fix his car.
[11] Q: Did he pay you back?
[12] A: Yes.
[13] THE COURT: Begin to wrap up.
[14] MR. EISEMANN: Your Honor, I think I am going to have
[15] to make record at a sidebar.
[16] THE COURT: First wrap up.
[17] MR. EISEMANN: Wrapping up will take another five
[18] minutes or so.
[19] THE COURT: You have to wrap up.
[20] MR. EISEMANN: What am I doing that makes me have to
[21] cut short this witness' testimony.
[22] THE COURT: Usually I don't subject myself to
[23] cross-examination. Sometimes that might happen, but not on
[24] this trial.
[25] Q: Have you ever loaned money to anybody else?

Page 990

[1] A: Money, maybe $10, $20, but that's the most I would loan
[2] someone other than him.
[3] Q: Have you ever borrowed money from anyone else?
[4] A: Yes, sometimes, to my brother, my brother.
[5] Q: At work, was there at the factory where you and Hector
[6] worked, was there a practice of people pooling their money into
[7] a, workers pooling their money in a centralized sort of pot of
[8] money?
[9] A: Yes. This was not something that the factory required of
[10] us; it was rather among the workers, let's say; each of us
[11] would maybe contribute about $50.
[12] MR. MUKASEY: I object; move to strike this answer.
[13] THE COURT: Sustained.
[14] MR. EISEMANN: Judge, rather than call the other
[15] witnesses to say the same thing, could we have a moment in the
[16] robing room to discuss it.
[17] THE COURT: As soon as the witness is finished we can,
[18] and the witness is almost finished.
[19] Q: Did Hector have a lot of money during the time you were
[20] working with him?
[21] A: No, no, never. If he had a lot of money he wouldn't be
[22] here in this country.
[23] Q: Was there anything that he ever did that made you suspect
[24] that he was involved in illegal drug dealing?
[25] A: Never, 100 percent for sure.

Page 991

[1] Q: Did he ever talk about drug dealing with you?
[2] A: Never.
[3] Q: Do you believe that he would be involved in drug dealing?
[4] MR. MUKASEY: Objection.
[5] THE COURT: Sustained.
[6] MR. EISEMANN: Nothing further.
[7] THE COURT: Anything from the government on this
[8] witness.
[9] MR. MUKASEY: No.
[10] THE COURT: That's it. Thanks very much.
[11] (Witness excused)
[12] MR. EISEMANN: Your Honor —
[13] THE COURT: Do you have any witnesses, anybody else.
[14] We will have a discussion.
[15] MR. MUKASEY: When defense rests we will.
[16] MR. BUCHWALD: We reserve for after the government.
[17] THE COURT: We will have a brief conference. We will
[18] excuse the jury for five minutes.
[19] (Jury leaves courtroom)
[20] (Continued on next page)

**Page 992**

THE COURT: Mr. Eisemann.

MR. EISEMANN: Your Honor, the government introduced into evidence Government Exhibit 133, I believe it is, that has, you remember, it's the chit sheet.

THE COURT: I remember it.

MR. EISEMANN: The government's theory, as I understand it, since they asked Agent Galbadis about this, is whether drug dealers often keep ledgers. That's their theory. I have a defendant who is facing a terribly serious charge. I am not trying to give your Honor a lecture that you said don't do. I want you to appreciate that that piece of evidence is probably the most central evidence against my client aside from the fact he is on the scene to decide whether he is innocent or is involved, as the government is portraying him, as a partner.

THE COURT: What do you want to do.

MR. EISEMANN: I am going to tell you. I have to lay a foundation as to why I want to bring this out. These witnesses will testify that there is a practice among people at my client's —

THE COURT: Pooling their salaries and recording who gets what amount, right.

MR. EISEMANN: That's not what the testimony would be. It would be that people put about $50 a week in every week, and somebody is the beneficiary of that sort of forced savings plan; people can have several thousand dollars that comes out

**Page 993**

of that plan. The government will argue that Mr. Ruiz loaned money because he has lots of money because he is a drug dealer. If they are not going to argue that, I guess this is not particularly important. If I don't get that representation, I have to meet that argument.

THE COURT: What germane testimony do you think any of the witnesses is going to give that will say what that sheet that's been admitted into evidence demonstrates.

MR. EISEMANN: One person on the stand is one of the people on the list, his middle name is Favio, the money he said he was owed at the time of the arrest.

THE COURT: Does he know about that list.

MR. EISEMANN: I didn't ask him about that list. I wouldn't think that would be the test for relevance. If he said I owed him so much money on this date, there is a piece of paper with his name that says he was owed about that much money at the time he was arrested. I think that passes the test of admissibility and relevance. I want to bring that out. There will be a question as to why my client was in a position to be able to loan money to people. I want the culture of this work to come through the witnesses that it was common for people to loan and borrow money.

THE COURT: It did.

MR. EISEMANN: From one witness in a pretty crappy way.

**Page 994**



[1] THE COURT: I don't want to comment on your technique.
[2] It's in evidence.
[3] MR. EISEMANN: I had to do it in the face of what I
[4] perceive your Honor is telegraphing unintentionally to the jury
[5] that the government's evidence is weighty and they are entitled
[6] to bring it out in excruciating detail. When I tried in the
[7] half hour I have spent in this whole trial putting witnesses
[8] on, maybe one hour of all the trial days, to bring out the
[9] facts, bring them to life so the triers of fact can consider
[10] them, determine whether in fact they are credible or not, your
[11] Honor cuts me off and says let's wrap it up. I think that's
[12] just not fair. I think that the jury, it's sending the wrong
[13] signal, not to mention that I am not able to get into the
[14] record important evidence in a way that this jury will assess.
[15]     The government I am sure will stand up in summation
[16] and argue this whole issue about lending money is not credible,
[17] the whole issue about how he has the money is not credible. I
[18] won't have anything to argue because I will have half witness
[19] testimony on this, several others precluded by your Honor. I
[20] don't think that's right. I don't think that's the way that
[21] people on trial for these kinds of crimes should have their
[22] cases tried. This is not a procedural hurdle on the way to
[23] conviction. I am trying to win the case. I have to put
[24] evidence on. I have nothing else to work with. Can I call the
[25] other witnesses to elicit that testimony.

**Page 995**

[1] THE COURT: I think your remark is preposterous, I am
[2] signaling to the jury one side is more credible than the other.
[3] You are entitled to your opinion.
[4] MR. EISEMANN: It will be my opinion.
[5] THE COURT: You spoke; now I speak. You are entitled
[6] to your opinion. I think I have given you tremendous latitude
[7] with respect to your witnesses. You called five people so far.
[8] They have no remote direct, not even remote, direct knowledge
[9] of anything having to do with the charges against your client,
[10] but essentially can talk and did talk about his character, and
[11] we have allowed that. How probative it is that your client
[12] gives somebody a ride to a baby shower to buy a baby gift or
[13] not is for others to decide. I have allowed that in. I think
[14] I have given you tremendous latitude.
[15]     On occasions there have been, there was one occasion
[16] in particular that I can pick up that I did cut you off in this
[17] trial. It had to do with the voir dire of the Spanish language
[18] interpreter, which I thought, and I hate to use the wrong word,
[19] I thought was so out there and so not probative and frankly so
[20] harmful to yourself, because you established at least for me, I
[21] am not the trier of fact, that that interpreter was an
[22] interpreter of such impeccable credentials that one might
[23] conclude that she was even more credible after your voir dire
[24] than she was before. That's neither here nor there. That's
[25] the time I recall that I cut you off. I think it was



Page 996

[1] appropriate to do so.
[2]     This is the next time. I think that your five
[3] witnesses, who know nothing about the case but do know about
[4] the character, have testified sincerely about the character of
[5] your defendant is enough. During the course of this testimony,
[6] one witness answered a question directly, you didn't like the
[7] answer, obviously, and then the next question you led her to
[8] change the answer, come up with a different answer. I cut you
[9] off there, and I would any time I would observe that.
[10]    MR. EISEMANN: On your question, was your —
[11]    THE COURT: If you don't mind, Mr. Eisemann, if you
[12] don't mind. Anyway, you made the record. I am responding.
[13] That's it. Are there any more witnesses.
[14]    MR. EISEMANN: Yes, two other witnesses who I would
[15] like to bring out the same information your Honor is precluding
[16] me from bringing out who can also talk about my client's
[17] reputation as a hard worker, getting up early in the morning.
[18] I would like to call them.
[19]    THE COURT: I think you have that in droves with the
[20] five witnesses. You have several who testified he wakes up at
[21] 3:00, 4:00 in the morning, drives one to work, and etc. The
[22] answer is yes. I think we have gone over this. In my
[23] discretion, I think it's time to wrap up. The answer is no, no
[24] more witnesses.
[25]    MR. EISEMANN: I am trying to make the record.

Page 997

[1]     THE COURT: No more witnesses is the answer.
[2]     MR. EISEMANN: You told me not to do what you are
[3] doing. When you are talking, I can't make the record. You are
[4] anticipating what I am going to say. Your Honor is precluding
[5] from me calling the witnesses.
[6]     THE COURT: Yes. How many times do I have to say it.
[7] No more witnesses. Can I say it any other way. That's it.
[8]     MR. EISEMANN: When your Honor did not let Deliana
[9] Fitzgerald answer the question when she said I didn't
[10] understand the question, your finding was that she was not
[11] believable when she said she didn't understand the question. I
[12] am making a record to understand the basis of your Honor's
[13] ruling. Is that right?
[14]    THE COURT: I don't subject myself to
[15] cross-examination. End of story. Anybody else.
[16]    MR. MUKASEY: If the defense have rested, we are going
[17] to call Special Agent Galbadis.
[18]    MR. EISEMANN: I have not rested; I have some other
[19] evidence, nontestimonial.
[20]    MR. SPORN: I object to them recalling the agent as a
[21] rebuttal witness. I think as it spun out, we have all that
[22] through cross of the witness. I think it would be cumulative,
[23] in addition to all the other argument we have had about it.
[24]    THE COURT: Anything else, Mr. Buchwald.
[25]    MR. BUCHWALD: It's our intention to call after their

Page 998

[1] rebuttal, if they have Dirks and Galbadis, it's our intention
[2] to request to be able to —
[3]     THE COURT: We will await your application until that
[4] time.
[5]     MR. EISEMANN: I have to make the last record, then I
[6] will let the subject drop. When your Honor precluded testimony
[7] that my client gave people rides and was paid for that, that
[8] was related to the claim that he was there on the night of the
[9] drug deal and was involved, not because he was, for instance,
[10] acting as a taxi service or doing him a favor. Having said
[11] that, I am precluded from eliciting that testimony?
[12]    THE COURT: Yes. We are finished.
[13]    MR. MUKASEY: Can we get a ruling on the mode and
[14] order of the next couple of witnesses.
[15]    THE COURT: There is only one, possibly two more,
[16] yours. Let's have your application why you need the agent,
[17] what he is going to testify to.
[18]    MR. MUKASEY: I jotted down about 7 questions, all of
[19] which are intended to rebut denials or misstatements made by
[20] William Duque during his testimony. Specifically —
[21]    THE COURT: Do we have those topics.
[22]    MR. MUKASEY: I can tell you what they are right now.
[23] If your Honor would like to see a copy of my proposed
[24] questions.
[25]    THE COURT: That might be easier. Share it with

Page 999

[1] Mr. Sporn too.
[2]     MR. MUKASEY: Let me tell you. I want to focus him on
[3] the meeting. I want to ask whether Special Agent Galbadis was
[4] taking notes at the meeting. I want to ask him to rebut
[5] what —
[6]     THE COURT: Ask Galbadis what.
[7]     MR. MUKASEY: Whether he was taking notes, being
[8] diligent, who did William Duque say gave him the suitcase of
[9] heroin to take to Aruba. The answer would be Carmen Julia and
[10] Niro and Mario. Did Duque ever say in the proffers that a man
[11] with a gun was one of the people who asked him to take the
[12] suitcase. I think the answer is nothing like that was ever
[13] said. Did he admit he had smuggled heroin for Carmen Julia
[14] before. Yes. Since he denied that Rosa, Carmen Julia, Mario
[15] were sending couriers on a regular basis, I want Galbadis to
[16] say that they were.
[17]    Did he ever mention Carmen Julia had people smuggle
[18] heroin to Holland or Mexico, which he said on the witness
[19] stand. Galbadis will stay no, he never told us in proffers
[20] that Holland or Mexico were potential destinations. Did he
[21] ever say to us at the United States Attorney's Office that he
[22] thought the heroin was going from Aruba to Holland, and the
[23] answer I think will be no. What was the only city ever
[24] mentioned as the destination for heroin; the answer will be New
[25] York.

Page 1000

MR. SPORN: First of all, I don't think that he should be entitled to elicit what my client may not have said at the meeting because that's not inconsistency. I am not sure I can actually get it in mind, unless I look at his questions, I wrote down exactly what the other questions there were. Not all of those statements were inconsistent with what he testified to.

THE COURT: I think we should focus on the ones you think are directly inconsistent, not omissions here and there.

MR. SPORN: There would be 2 or 3 questions.

THE COURT: I agree with Mr. Sporn on that. Go over the list. I think that's right; it does come down to 2 or 3 questions.

MR. MUKASEY: The proffer agreement says if he asserts a defense at trial that is different from what he told us —

THE COURT: It has to be inconsistent or different. I am not sure omissions are qualified. There are a couple of areas there that struck me as being —

MR. MUKASEY: Did William Duque ever say in the meeting that he thought that the heroin that he was taking to Aruba was destined for Holland, if the answer is no, the only discussion of any city was New York, I think we should be permitted to elicit that.

MR. SPORN: That's not an inconsistent statement; he just didn't say it.

Page 1001

THE COURT: Spend a minute refining that list, Mr. Mukasey.

(Pause)

MR. MUKASEY: He said on the witness stand that he told us in the proffer that he thought it was going to Holland.

THE COURT: I understand. Spend a minute, refine the list to what you think are specific instances. I think you are entitled to some. Then decide whether it's worth the candle, so to speak. That's up to you.

(Pause)

THE COURT: Where are we.

MR. MUKASEY: We have worked out 3 or 4 questions I am going to ask Agent Galbadis.

THE COURT: That Mr. Sporn is agreeable to.

MR. SPORN: One second.

(Pause)

THE COURT: Mr. Buchwald, you might be doing the same thing with Mr. Mukasey, to see if there is common ground with respect to any proposed surrebuttal.

MR. BUCHWALD: The two questions will help.

THE COURT: See if he has a problem with it.

(Pause)

MR. BUCHWALD: Assuming the jury gets the case early tomorrow afternoon, as it sounds like —

THE COURT: I am hoping about lunchtime.

Page 1002

[1] MR. BUCHWALD: Will you let them deliberate in the
[2] evening.
[3] THE COURT: I think you are safe, you are going and
[4] staying.
[5] MR. BUCHWALD: Saturday night are my tickets for five
[6] days. This is work with a bunch lawyers and clients, scheduled
[7] a long time in advance. If it were possible to keep them, we
[8] might mention to them the possibility they might be staying
[9] late, for planning purposes.
[10] THE COURT: Maybe. I am willing to go a little
[11] longer. I am not a night person for jurors. It's OK with me.
[12] MR. BUCHWALD: Give them a heads-up. I don't know if
[13] there are childcare problems, things like that.
[14] THE COURT: OK.
[15] MR. MUKASEY: Let me tell you the questions I propose,
[16] all inconsistent with denials that William Duque made on the
[17] witness stand.
[18] THE COURT: The issue is if there is disagreement, we
[19] have to resolve the disagreement. That's what I am saying. I
[20] don't know how we are going to do that if you don't have it on
[21] consent. I can't remember and I don't know, and I don't know
[22] what Mr. Sporn wants to do in the event that he disagrees with
[23] the disagreement, so to speak. That's all I am saying.
[24] MR. SPORN: We are down to a few questions we
[25] apparently don't agree about.

Page 1003

[1] MR. MUKASEY: Three.
[2] MR. SPORN: I think it's not worth the whole thing,
[3] because it came out.
[4] THE COURT: You have to consider that. I think that's
[5] a fair consideration.
[6] MR. MUKASEY: I stood up this morning and said if we
[7] don't get into the proffers we are not going to do it, but he
[8] opened it up. He was, you know —
[9] THE COURT: I understand.
[10] MR. MUKASEY: — foaming at the mouth about the
[11] proffers, so I have to get into it.
[12] THE COURT: What I think, this is not a ruling, as a
[13] practical sense I think we are all better to the extent we
[14] agree to focus on those, not others, then it could open up the
[15] proceeding again for more proceeding.
[16] MR. MUKASEY: I will focus on the questions that I
[17] thought were inconsistent with the trial testimony and I won't
[18] ask about omissions, things he did not say.
[19] THE COURT: Do you agree with those questions.
[20] MR. SPORN: No, one or two questions that he contends
[21] are inconsistent, and arguably they were, I understand his
[22] position, I have the position that I think it is reasonable to
[23] think they are not; therefore, he shouldn't asked them.
[24] THE COURT: Do you want me to look at them.
[25] MR. MUKASEY: The questions are —



Page 1004

[1] THE COURT: Give me what you have agreement on.
[2] MR. MUKASEY: We both agree that I may ask, did
[3] William Duque ever say in the meetings at the United States
[4] Attorney's Office that he thought that heroin was going from
[5] Aruba to Holland. The answer I guess is going to be no.
[6] THE COURT: Do you agree with that.
[7] MR. SPORN: The short answer is not so much that I
[8] agree, I don't have I have a choice; the testimony was
[9] inconsistent.
[10] THE COURT: You agree with the inconsistent, so.
[11] MR. SPORN: I think it's arguably inconsistent.
[12] MR. MUKASEY: I also want to ask whether he told us at
[13] the United States Attorney's Office that Carmen Rosa was
[14] sending heroin and couriers on a regular basis to the U.S. I
[15] believe there was a denial of that during the testimony.
[16] THE COURT: Then I thought on either redirect or
[17] whatever he acknowledged that.
[18] MR. SPORN: Exactly.
[19] MR. MUKASEY: He said he imagined and suspected but he
[20] didn't know. If it's such rehabilitation, what's the harm in
[21] asking the question.
[22] MR. SPORN: He didn't have personal knowledge; he
[23] acknowledged it must have been so because of things this woman
[24] Carmen said because they were all there, the other people; it's
[25] not inconsistent.

Page 1005

[1] THE COURT: Go ahead.
[2] MR. SPORN: And it's cumulative.
[3] MR. MUKASEY: He denied recruiting couriers for Rosa
[4] on the witness stand. He told us flat off at the United States
[5] Attorney's Office that he did do that.
[6] MR. SPORN: He did deny it. The agents notes say that
[7] he did make that statement, which he denies having made.
[8] THE COURT: That's inconsistent clearly.
[9] MR. MUKASEY: That's really it.
[10] THE COURT: Three, of which one is disputed.
[11] MR. MUKASEY: One disputed. Did he tell us in the
[12] United States Attorney's Office that he knew Rosa was sending
[13] people on a regular basis here. The jury is entitled to know
[14] he in fact knew, not that he suspected, not that he deduced.
[15] MR. SPORN: If the agent writes down he knew, that
[16] doesn't mean he didn't say at the proffer session that she must
[17] have been doing it. We are peeling the onion very thin here.
[18] THE COURT: Let's move to the robing room and see if
[19] we can't resolve it.
[20] (In the robing room)
[21] THE COURT: My personal view, it's not definitive
[22] since I don't have the two records so to speak to compare, in
[23] terms of the practicality of the trial, I think it would make
[24] sense to do the two questions that there is agreement on and to
[25] not do the third. But it's not my call in that respect because

Page 1006

[1] I can't exactly say. I do recall that there was some
[2] turn-around so to speak in his testimony, that he originally
[3] did say, this is my recollection, it's not gospel, that he
[4] didn't, he flatly said he didn't recruit, then on redirect he
[5] was moving in the direction of, well, he assumed, rather, what
[6] did he say?
[7] MR. SPORN: First he said, he flatly said he didn't
[8] know.
[9] THE COURT: There were other couriers going to New
[10] York, absolutely didn't know, then he said on redirect that he
[11] assumed there were so many people waiting there, took them such
[12] a long time, started to move in that direction, it's sort of a
[13] gray area with 3 questions. Let's assume you ask it, what's
[14] your next step.
[15] MR. MUKASEY: One of the questions, maybe this will
[16] help your response, one of the questions I normally ask in a
[17] criminal trial when a proffer statement comes in, were you
[18] told, I ask of the agent, were you present when Mr. Duque, for
[19] example, was told to be fully and completely honest during this
[20] proffer. That's why I want to ask about these omissions. It's
[21] remarkable that man, whom he now says on the witness stand, I
[22] told them everything, I told it was going to Holland, that's
[23] where I thought it was going. Now we can't elicit that he
[24] never made those statements at the proffer. He is lying with
[25] impunity on the witness stand. That's why we sign them up to a

Page 1007

[1] proffer agreement.
[2] MR. SPORN: I don't know what you are getting excited
[3] about. I thought you were permitted to ask that question.
[4] MR. MUKASEY: He gave about 50 other statements
[5] including being pressured by man, a man with a gun to do this.
[6] He was told to be fully honest. He never told us that in the
[7] United States Attorney's Office. I am digressing.
[8] THE COURT: It's just a question how much process you
[9] want to open up and what it's worth.
[10] MR. MUKASEY: I don't, I know the court's view, want
[11] to drag it out. We are going to finish. I appreciate everyone
[12] has streamlined their examinations. I am going to ask if
[13] William Duque ever said in the meeting at the United States
[14] Attorney's Office that he thought heroin was ultimately
[15] destined for Holland, I will if that's OK with Mr. Sporn.
[16] MR. SPORN: Say is again.
[17] MR. MUKASEY: Did William Duque ever say in any
[18] proffer meeting at the United States Attorney's Office that he
[19] thought after he took the heroin to Aruba it was bound for
[20] Holland.
[21] MR. SPORN: I think I am stuck with having to live
[22] with that question.
[23] MR. MUKASEY: Since he said Mexico on the witness
[24] stand, I am going to ask if he ever said anything about Mexico.
[25] MR. SPORN: I don't see what that has to do with

Page 1008

anything.

THE COURT: I will permit Holland to the exclusion probably, but just to get finality, I think Holland is the key point that did come out several times, his understanding. I think he said specifically he overheard two people say that this was going to Holland.

MR. SPORN: Carmen and Mario.

THE COURT: Holland sticks in one's mind from the transcript.

MR. MUKASEY: That he brought Rosa couriers, denied on the witness stand, admitted in the United States Attorney's Office.

MR. SPORN: Your Honor —

MR. MUKASEY: I am going to ask Galbadis —

MR. SPORN: You are not going to elicit that he brought couriers, that he told, in your view that's what he said.

THE COURT: That he recruited couriers for Rosa.

MR. MUKASEY: Right. I think a very fair question, what's the only city that William Duque ever talked about in the United States Attorney's Office as the destination for heroin, the only city he ever stated was New York.

MR. SPORN: That's absolutely objectionable.

THE COURT: This is my opinion, I don't think you need it. The only other city is Holland, really, that comes out as

Page 1009

inconsistency. The jury has heard over and over, they know Diaz came from New York, they know he had small talk, they both lived in New York. It's pretty clear. I don't think you need it, is what I am trying to say, those two questions, because you will have agreement. We are best off that way.

MR. MUKASEY: We will take what we can get.

MR. SPORN: I am going to have cross-examination.

THE COURT: On the two questions.

MR. SPORN: Yes, the whole thing to me, it's not my call.

MR. MUKASEY: If he crosses by saying if there was an original plan to have them take the heroin to New York but he was too scared, did he ever say —

MR. SPORN: No, I am not going to cross him about that.

MR. MUKASEY: Do you understand if you leave the jury with an impression where the heroin was destined for was a mystery according to what he said at this proffer, I am going to get back up, piss everybody off.

THE COURT: You have to do whatever you do. We will see what happens.

MR. SPORN: We will both do what we have to do.

THE COURT: Are there any open issues I have not resolved you need to have me resolve in order to close the record.

Page 1010

[1]   MR. SPORN: Not from me.
[2]   MR. EISEMANN: Not from me.
[3]   MR. BUCHWALD: I think it's now fairly in the record
[4] that William has on prior occasion, basically from the get-go
[5] after his initial lying in Aruba on September 16, but after
[6] that, has said that James had nothing to do with it. If we are
[7] in agreement, that's basically in the record, I am not going to
[8] further complicate things, that also happened at the proffer.
[9] I think it's complicated enough. I don't want somebody
[10] complaining, why argue in summation —
[11]   MR. MUKASEY: He said it. It was among the many
[12] musings he gave us on the witness stand.
[13]   THE COURT: But it's there.
[14]   MR. BUCHWALD: I think it's there. I don't see any
[15] reason to complicate.
[16]   THE COURT: We will probably talk. He wants
[17] surrebuttal. Did you hear his two questions.
[18]   MR. BUCHWALD: The questions will be when Dirks
[19] testified, he testified concerning asking you how William knew
[20] to come to Drive Motors and he testified that you told him that
[21] there had been a telephone conversation between you and
[22] William. Did you tell Dirks any such thing. Answer, no.
[23] What, if anything, did you say to Dirks when he asked how
[24] William knew to come to Drive Motors. Answer, that William had
[25] spoken to my sister Vilma on the phone.

Page 1011

[1]   THE COURT: That's already in the record. William
[2] said that and both William and James, the latter, both William
[3] and James said it already.
[4]   MR. BUCHWALD: He denies. We want him to be
[5] specifically denying that he told Dirks that there was a prior
[6] telephone conversation between them and to say what he did tell
[7] Dirks on that topic.
[8]   MR. MUKASEY: I am not as experienced as you guys, I
[9] think between the two of us, we have never heard surrebuttal.
[10]   THE COURT: That's his proposal; I am not ruling.
[11]   MR. MUKASEY: We have the burden of proof. We ought
[12] to get the last word. Unless you are willing to argue that we
[13] don't have the burden of proof, let's not raise that to the
[14] jury. Second, he impeached Dirks already. You didn't put in
[15] your report, Mr. Dirks, about this alleged telephone call, did
[16] you. No, I didn't. He can argue it never happened.
[17]   THE COURT: Even more in my view persuasively, he said
[18] no contact for ten years. So, James said that already.
[19]   MR. BUCHWALD: James has said that. We want James to
[20] specifically, categorically, I wasn't there, I don't know what
[21] happened, but I would bet a dollar to a donut that Dirks is
[22] absolutely wrong about that testimony. Whether that's
[23] something he heard from William, whether that's something he
[24] heard from somebody else, whether it's conversation with Vilma
[25] and becomes conversation with William, I don't know. I would



Page 1012

[1] bet a dollar to a donut that was never said to Dirks, and
[2] indeed I cannot imagine if such statement was made, it wouldn't
[3] get into his report.
[4]   MR. MUKASEY: A legal point. It happened during
[5] William's testimony and during James' testimony, posing
[6] questions like this, sir, you heard testimony from so-and-so
[7] that such and such happened, is that person telling the truth
[8] essentially, and William said no, no Dirks was lying, and James
[9] said no, no, Diaz is lying.
[10]   THE COURT: That wasn't the question.
[11]   MR. MUKASEY: That's what came out. The body who
[12] decides who is lying is the jury. I understand what
[13] Mr. Buchwald wants to do, but he got his impeachment of Dirks.
[14] Having James tell us Dirks is lying, it's not proper.
[15]   THE COURT: Let's get ready for this. After this I
[16] will rule on your issue. I think I am inclined that the record
[17] should rest. So it's clear, your points are already in there.
[18]   MR. EISEMANN: In a continuing effort to make a record
[19] about this issue, there were a couple points I didn't make.
[20] Number 1, the witness who I would have called, Diego Carvajal,
[21] the brother of John Carvajal, Walter Valencia, both are here,
[22] from LIF Industries. They like John Carvajal would have talked
[23] about the general practice of pooling of money as I described
[24] on the record. As all three witnesses, including John Carvajal
[25] would have described it, Hector Ruiz personally participated in

Page 1013

[1] that and therefore would have established, that would have
[2] established why I had money to be able to loan. To the extent
[3] the government is going to argue against that, my application,
[4] may I be able to put witnesses on the stand, including John
[5] Carvajal, to be able to establish those facts.
[6]   MR. MUKASEY: If he wants to call them, I don't have
[7] an objection, if the court wants to make a decision in that
[8] regard.
[9]   THE COURT: You have no objection. Call him.
[10]   MR. MUKASEY: I would ask, questions that consistently
[11] get sustained objections, such as do you think this guy would
[12] ever deal drugs, looks like a drug dealer, keep this to
[13] character.
[14]   THE COURT: These witnesses have been cumulative.
[15] These would be cumulative with testimony already in there. Why
[16] don't you work out a stipulation that if more witnesses were
[17] called, they would say such and such, then there wouldn't be
[18] any objections, extraneous comments. Some of these comments, I
[19] am not being critical, but are far from character and who knows
[20] what they are, people saying he got up at 3:00 in the morning,
[21] took me to work.
[22]   MR. EISEMANN: Going to showing he is a hard-worker.
[23]   THE COURT: Yes, we clearly said it, his neighbor said
[24] it, his girlfriend said it, his cousin said it, you know,
[25] that's my point, how many times. It's clear.

Page 1014

[1]   MR. EISEMANN: All right.
[2]   THE COURT: You have not been prejudiced; it has come
[3] in.
[4]   MR. EISEMANN: If the government will not be arguing
[5] he was not a hardworking man.
[6]   MR. MUKASEY: I am going to focus on the heroin that
[7] was found in his car, not his work ethics.
[8]   THE COURT: Some day we will have lunch. There is not
[9] a whole lot in the record about your client, certainly none of
[10] these issues are in there. There is about essentially that he,
[11] well, whatever.
[12]   MR. EISEMANN: The piece of paper with the numbers on
[13] it that I have to confront, I have to explain away, I need to
[14] have a basis.
[15]   THE COURT: Nobody who you are going to call is going
[16] to be able to explain that piece of paper.
[17]   MR. EISEMANN: One guy has linked it up sufficiently;
[18] his middle name is Favio.
[19]   THE COURT: You got his testimony. Nobody else is on
[20] that piece of paper.
[21]   MR. EISEMANN: Yes.
[22]   THE COURT: Even Favio doesn't know anything about
[23] that piece of paper per se. He knows about the practice of
[24] pooling, blah, blah, blah. Nobody knows about the piece of
[25] paper.

Page 1015

[1]   MR. EISEMANN: He testified that Hector Ruiz had
[2] loaned him about $700, the number is $400 on the sheet; that
[3] makes it more credible than less. I think that sufficiently
[4] links it up. I am going to argue it.
[5]   THE COURT: Ask him if he will do something to
[6] stipulate, not counter your argument, then you may not have any
[7] concerns.
[8]   MR. EISEMANN: Is there any possibility of stipulating
[9] that witnesses would have testified that Hector Ruiz had loaned
[10] money to a couple of people, that's the reason why the numbers
[11] are on the list.
[12]   THE COURT: No, the second part I don't think he is
[13] going to say, because those names are not on that list, except
[14] one name. He would probably agree, if called, people would say
[15] they also lent or borrowed money from Hector Ruiz. If you want
[16] to call them, I think you are going to waste a lot of time.
[17]   MR. EISEMANN: I can live with, I don't have to call
[18] them, saying that he loaned money.
[19]   MR. MUKASEY: I can't stipulate to that.
[20]   THE COURT: Call them.
[21]   MR. MUKASEY: I think it's objectionable testimony and
[22] irrelevant.
[23]   (Continued on next page)
[24]
[25]

**Page 1016**

(In open court; jury present)
THE COURT: I have had a conversation with the lawyers.
Are you, Mr. Sporn, calling any further witnesses.
MR. EISEMANN: I will call two witnesses, your Honor.
THE COURT: Go ahead.
MR. EISEMANN: Mr. Ruiz calls Diego Carvajal.
(Through interpreter)
DIEGO CARVAJAL,
called as a witness by the Defendant,
having been duly sworn, testified as follows:
DIRECT EXAMINATION
BY MR. EISEMANN:
Q: Do you know a man named Hector Ruiz who is sitting here?
A: Yes.
Q: How do you know him?
A: We grew up together in my country.
Q: When did you come to the United States?
A: In '91.
Q: You can keep your voice up even though he is translating for you. When you came to the United States was Hector already living in the United States or did he follow you?
A: He came after I did.
Q: Where are you working now?
A: LIF Industries.

**Page 1017**

Q: What do you do there?
A: Right now I am programming (English).
Q: I am sorry?
THE COURT: He is in programming.
Q: At LIF Industries is there an office pool where people put their money together?
A: Yes, we do it ourselves, the employees ourselves.
Q: Just briefly describe for the jury and for Judge Berman how that works, how much do you put in, when people get it back?
A: $50 per week when the year starts, and in December we return the money to the person that corresponds to that person.
Q: Is it basically to use group pressure to force you to save money?
A: Yes.
Q: Did you participate in that yourself?
A: Yes, I have always been in charge of that.
Q: Did Hector Ruiz participate in it?
A: Yes.
Q: Is there a person named Juan Gonzalez that works in LIF Industries?
A: Yes, used to work.
Q: Did he participate in that?
MR. MUKASEY: Objection.
THE COURT: If you know.
A: Yes, yes.

**Page 1018**

[1] Q: Is there a person who goes by the nickname Negro who works
[2] at LIF Industries?
[3] A: Yes.
[4] Q: What's his real name?
[5] A: Eldiperlsa, E-L-D-I-P-E-R-L-S-A.
[6] Q: Did he participate in the pool?
[7] A: Yes.
[8] Q: Is there a person working at LIF named Juaco?
[9] A: Yes.
[10] MR. MUKASEY: I object to this testimony as
[11] irrelevant, based on hearsay.
[12] THE COURT: He objected based on irrelevant and
[13] hearsay. I will allow it only to the extent we discussed. We
[14] need to wrap up.
[15] Q: What's his real name?
[16] A: Joaqin.
[17] Q: Did he participate in the pool?
[18] A: Yes.
[19] MR. EISEMANN: Nothing further.
[20] THE COURT: Anything from the government.
[21] MS. GOLDBERG: One moment, your Honor.
[22] (Pause)
[23]            CROSS EXAMINATION
[24]            BY MS. GOLDBERG:
[25] Q: You indicated you are in charge of this pool at LIF

**Page 1019**

[1] Industries?
[2] A: Yes, with another person.
[3] Q: How long have you been in charge of this pool?
[4] A: Two years ago and this year because last year I wasn't here
[5] in the city.
[6] Q: I am sorry, could you repeat that; two years you have been
[7] involved?
[8] A: Yes.
[9] Q: Along with another person?
[10] A: Yes.
[11] Q: There are lots of people who participate in this pool?
[12] A: 30 people.
[13] Q: As I understand it everybody puts $50 a month into the
[14] pool?
[15] A: Per week, per week.
[16] Q: $50 per week?
[17] A: Yes.
[18] Q: All of these 30 or 40 people?
[19] A: Yes, basically it's 25 and 30 pesos, but if you want to
[20] take 2 posts, then you make it 50.
[21] Q: $50?
[22] A: Yes.
[23] Q: Then there are times I guess periodically that people
[24] withdraw money from the pool?
[25] A: Yes.



Page 1020

[1] Q: If they have some sort of expenses they need to pay?
[2] A: Yes.
[3] Q: As somebody in charge of this pool you are responsible for
[4] keeping track of all these different people, right?
[5] A: Yes, yes, of course.
[6] Q: Do you have records regarding this pool here in court
[7] today?
[8] A: No, not here.
[9] Q: Did you give those records to Mr. Eisemann?
[10] A: No, no because I wasn't here in the city and all that. I
[11] never spoke about that.
[12] MS. GOLDBERG: Nothing further, your Honor.
[13] MR. EISEMANN: One question.
[14]            REDIRECT EXAMINATION
[15]            BY MR. EISEMANN:
[16] Q: You and I didn't speak at all until we met in the hallway
[17] about an hour ago?
[18] A: Yes.
[19] MR. EISEMANN: Nothing further.
[20] THE COURT: We can excuse the witness. Anybody else.
[21] (Witness excused)
[22] MR. EISEMANN: No, I am not going to call the other
[23] witness.
[24] THE COURT: Thanks very much.
[25] Can I just see counsel for a minute at the sidebar

Page 1021

[1] (At the sidebar)
[2] THE COURT: I am going to let Mr. Buchwald recall
[3] James to ask him one question before you get your rebuttal and
[4] the one question is whether James made a phone call.
[5] MR. BUCHWALD: I can't ask him what he did say.
[6] THE COURT: That's it. Everything else is in the
[7] record.
[8] MR. BUCHWALD: He has not testified about it.
[9] THE COURT: You said the only thing that you wanted to
[10] controvert was directly Dirks saying that there was that call
[11] before they hooked up in Aruba. I will allow you to ask that
[12] one question. That's it. Then your rebuttal.
[13] MR. EISEMANN: There is a videotape cued up, five
[14] minutes, I have two stipulations I will do whenever you want.
[15] THE COURT: I want to get it done.
[16] MR. EISEMANN: Before the witness or after, I don't
[17] care.
[18] MR. MUKASEY: Since you are doing your witness, it
[19] makes sense to let him finish, then have Mr. Buchwald go.
[20] THE COURT: I don't want it to drag.
[21] MR. EISEMANN: The tape is five minutes long; the
[22] stipulations are 30 seconds.
[23] (Continued on next page)
[24]
[25]

Page 1022

[1] (In open court)
[2] THE COURT: OK, folks, time is awasting.
[3] MR. EISEMANN: Your Honor, I offer as Defendant
[4] Exhibit HR-C, the surveillance video taken by the government at
[5] the meeting on August 27, 2002 in Queens between Hector
[6] Carvajal and Jose Diaz.
[7] THE COURT: It's in evidence already.
[8] MR. EISEMANN: I am offering it.
[9] THE COURT: Any objection.
[10] MS. GOLDBERG: No objection.
[11] THE COURT: I will allow it.
[12] (Defendant Exhibit HR-C received in evidence)
[13] MR. EISEMANN: It's cued up, if I could just play it.
[14] The Jeep is in the video as well.
[15] (Videotape played)
[16] MR. EISEMANN: Your Honor, when Mr. Diaz arrives on
[17] the scene I will fast-forward it.
[18] (Videotape continuing)
[19] MR. EISEMANN: Your Honor, I will fast-forward and
[20] indicate there are three people there.
[21] (Videotape continuing)
[22] MR. EISEMANN: I have paused the tape to show a woman
[23] and two men.
[24] THE COURT: That's it.
[25] MR. EISEMANN: Two stipulations, your Honor, some

Page 1023

[1] evidence. Your Honor, it's stipulated by and between the
[2] government and defendant Ruiz, without objection from the other
[3] defense counsel, the government and Mr. Ruiz have stipulated
[4] that on September 4, 2002, Hector Carvajal and an unidentified
[5] woman who has been discussed at this trial had a conversation
[6] which was recorded, and an excerpt of the conversation went as
[7] follows:
[8] "UNIDENTIFIED FEMALE: You don't have a car, honey.
[9] "HECTOR CARVAJAL: Not until this weekend,
[10] "UNIDENTIFIED FEMALE: But do you —"
[11] There is an interruption.
[12] "HECTOR CARVAJAL: I have got to —"
[13] Then three dots for interruption again, then:
[14] "UNIDENTIFIED FEMALE: — have anyone who will lend it
[15] to you?
[16] "HECTOR CARVAJAL: Well I have someone who will lend
[17] it to me, but the thing is, I don't like to see people just to
[18] ask them to lend me a car."
[19] (Continued on next page)
[20]
[21]
[22]
[23]
[24]
[25]

**Page 1024**

MR. EISEMANN: Next there is a stipulation that the government stipulates that Hector Ruiz has never been arrested aside from this case.

And lastly, your Honor — I'll just consult with the government.

(Pause)

MR. EISEMANN: Your Honor, I'm going to offer now as Defendant's Exhibit HRB — I'll hand up a copy to your Honor first. A portion of the documents that the government agrees was taken from Mr. Ruiz on the date of his arrest, and it's a series of — not every document, but a series of the documents.

MR. MUKASEY: What's the relevance to the eight million markings on those documents?

THE COURT: I'll allow it.

MR. EISEMANN: With that, if I could just look at my notes.

MR. MUKASEY: Judge, there's also a U.S. government — a couple of documents in there that I think are — contain hearsay.

THE COURT: Overruled.

MR. EISEMANN: Judge, Defendant Ruiz rests.

THE COURT: I'm going to allow the exhibit.

Mr. Sporn, you've rested. And at this time, I'm going to allow Mr. Buchwald to recall Mr. Duque to ask him one remaining question.

**Page 1025**

MR. BUCHWALD: May I proceed, your Honor.

DEPUTY CLERK: Counsel, one moment. Mr. Duque, before we begin, I would just like to remind you that you're still under oath.

DEFENDANT J. DUQUE: Yes.

DEPUTY CLERK: You may be seated.

MR. BUCHWALD: May I proceed, your Honor?

THE COURT: Yes.

JAMES DUQUE, called as a witness by the Defendant, having been previously sworn, testified as follows:

DIRECT EXAMINATION
BY MR. BUCHWALD:

Q: During Officer Dirks' interview of you on Monday, September 16th, did you ever tell Officer Dirks that William knew he could find you at Drive Motors on Saturday because you and William had had a telephone conversation?

A: No, Sir. Never.

THE COURT: Thank you. Anything further?

CROSS EXAMINATION
BY MR. MUKASEY:

Q: You were in Court when your wife testified, weren't you?

A: Yes, sir.

Q: She said she was a friend of Officer Dirks, right?

A: That she knew him.

**Page 1026**

[1] MR. MUKASEY: Thank you.
[2] THE COURT: Thank you very much.
[3] THE WITNESS: Thank you.
[4] THE COURT: And now the government is calling Special
[5] Agent Galbadis; is that correct?
[6] MR. MUKASEY: Correct.
[7] THE COURT: Let me just mention this to the jury in
[8] connection with this testimony:
[9]    Because the government bears the burden of proof, it
[10] is given the opportunity to present witnesses after the
[11] defendants have rested their case. Special Agent Galbadis is
[12] such a witness, but I also want to point out yesterday the
[13] government called Richard Dirks, also as a rebuttal witness,
[14] after James Duque testified. Normally, the government would
[15] have waited till now to call Officer Dirks as well, but Officer
[16] Dirks had to return home to Aruba, so it was agreed among all
[17] parties that he could come and testify out of turn, as it were,
[18] as a rebuttal witness. So I just wanted to explain that.
[19]    (Witness sworn)
[20] DEPUTY CLERK: State your name for the record.
[21] THE WITNESS: Steven Galbadis, G-a-l-b-a-d-i-s.
[22] DEPUTY CLERK: Thank you, Sir.
[23] STEVEN GALBADIS,
[24] called as a witness by the Government's,
[25] having been duly sworn, testified as follows:

**Page 1027**

[1]              DIRECT EXAMINATION
[2]              BY MR. MUKASEY:
[3]    Q: Special Agent Galbadis, did you attend a meeting at the
[4] United States Attorney's office in February of 2002 in relation
[5] to this case?
[6]    A: Yes, I did.
[7]    Q: I'm sorry, February, 2003. I apologize.
[8]    A: That's correct, it is February, 2003.
[9]    Q: Who attended that meeting?
[10]   A: Myself, an Assistant U.S. Attorney, William Duque, an
[11] interpreter, and his attorney at the time, Mr. Villanueva.
[12]   Q: Was that a meeting that William Duque had requested to have
[13] with the U.S. Attorney's office?
[14]   A: Yes, it was.
[15]   MR. SPORN: I object to that, your Honor. It's
[16] irrelevant.
[17]   THE COURT: I'll allow it. Let's move along.
[18]   A: Yes, it was.
[19]   Q: What was the general topic of discussion at the meeting?
[20]   A: Basically, we were discussing —
[21]   MR. SPORN: Objection.
[22]   MR. MUKASEY: Just setting the stage.
[23]   THE COURT: One background. The background is enough.
[24]   Q: Just tell us the general subject matter that was discussed
[25] at the meeting.



Page 1094

[1] (In open court; jury not present)
[2] THE COURT: I wanted to discuss that instruction I
[3] think we found a good place to locate the language you wanted,
[4] Mr. Sporn, if you could take a look at it —
[5] MR. MUKASEY: Miss Goldberg's looking at it.
[6] THE COURT: I'll show you. This is the draft. We put
[7] it on Page 14.
[8] MS. GOLDBERG: With the exception of the fact that
[9] it's the same thing: We're mixing Element 2 with Element 1. I
[10] mean, here you're talking about the existence of the
[11] conspiracy — I'm not sure there's any way around it, your
[12] Honor. But because of the fact that there's no sort of obvious
[13] place to put it — you know, the objection is not to the
[14] language, it's just that we have sort of mixed Element 1 and
[15] Element 2.
[16] MR. SPORN: Well, what Lauren is saying is a fair
[17] comment. I think she's right, but I don't know any way around
[18] it. You know. I mean, your Honor does say, the first
[19] element — well — would it make sense to say — I have to sort
[20] of see what's said before.
[21] THE COURT: Take a look. I'll be right back.
[22] (Off the record)
[23] THE COURT: I thought I had an easy solution. We'll
[24] have to look at it some more.
[25] MR. SPORN: I'm writing something.

Page 1095

[1] THE COURT: Okay, we have to have the jury come back
[2] in. We'll discuss it at the next break.
[3] MS. GOLDBERG: All right.
[4] (Continued on next page)

Page 1096

[1] (In open court)
[2] THE COURT: Please be seated. We'll continue with
[3] Mr. Eisemann.
[4] MR. EISEMANN: Thank you, your Honor.
[5] Ladies and gentlemen, this is a case about assumptions
[6] and mistakes. Big assumptions and big mistakes. And big
[7] exaggerations. You remember in the opening of this trial where
[8] Mr. Mukasey stood before you and he never — well, not never,
[9] but he frequently mentioned the name Hector Carvajal by
[10] prefacing it and saying, "Hector Ruiz's drug partner, Hector
[11] Carvajal". "An international drug dealing conspiracy and the
[12] partner of Hector Ruiz, Hector Carvajal."
[13] And the reason why he did that, I submit, was he was
[14] trying to use rhetoric and he was trying to use exaggeration to
[15] cover up for what is not in this case, and that is evidence.
[16] At the beginning of this trial I'm sure when you heard
[17] the opening, before you even heard me speak, you thought, This
[18] guy, Hector Ruiz, he's the guy behind the scene. He's the big
[19] partner in this big international drug conspiracy.
[20] Well, now that you've heard the evidence, as you sit
[21] here today, do you really believe he's the guy that runs the
[22] show? Do you think you have any evidence he's back there
[23] running the show? Of course not. This was Carvajal's show.
[24] Carvajal's the guy that gave all the instructions to Jose Diaz
[25] and his wife. He made all the arrangements. He made all the

Page 1097

[1] payments. He gave the plane tickets to them. He instructed
[2] them about what they should do when they get to Aruba. He
[3] insisted that they meet with him before they go to Aruba so he,
[4] Carvajal, could look at their plane tickets and their
[5] passports, make sure they're really going there. He insists on
[6] seeing their proof of citizenship. And Carvajal told them:
[7] When you got to Aruba, call me, Carvajal, tell me what hotel
[8] you're staying at. Not only that, tell me in code.
[9] So Carvajal was giving all the instructions about what
[10] should happen. He told them when they get there, they could
[11] inspect the suitcase. Carvajal says this. If you're not
[12] satisfied with the suitcase, you don't have to make the trip.
[13] He told them what to do when they get back to New York. He
[14] said — well, of course he told them when the heroin was
[15] arriving. Carvajal's the guy, by the way, who calls and speaks
[16] to Jose Diaz or vice versa and says, It's coming on Friday or
[17] Saturday; they'll be there.
[18] Hector Ruiz is not involved in this at all. He's not
[19] making calls. He's not coordinating with anybody. The first
[20] time that the agents told you they even knew there was a Hector
[21] Ruiz was when they saw Carvajal driving his car. They didn't
[22] see his face. They ran the registration plate, which is
[23] reasonable: There's a guy named Hector and they ought to know
[24] his last name, meeting Jose Diaz on the street. They run that
[25] license plate check and they get the name Hector Ruiz. And

Page 1098

at's the beginning of Mr. Ruiz getting involved in this case accident. Understandable accident, but still, not a basis convict somebody. There was never any surveillance of r. Ruiz. There was never any discussion of Mr. Ruiz. His me never even came up. There was no discussions with him. You heard Agent Galbadis tell you there were about 12 15 conversations between Carvajal and either — and r. Diaz, I guess, and in not one of them was the name Hector iz mentioned. Now, you heard only about three or four maybe e of these conversations, or bits of them. But you know m the testimony of Agent Galbadis that his name did not come . You know there were many meetings between Hector Carvajal d Jose Diaz, at least five or six, I think Agent Galbadis id. And not one of them did Mr. Ruiz attend. At not one of em did his name come up. He was, in short, not present cause he was not involved.

You know that for other reasons. Carvajal said, Meet e when you come back to New York. Meet me to deliver the ugs to me. Not us. Me. Not any other male. Now, he did y, If you have a problem when you're in Aruba or if you can't d me when you come back, call her — his mystery woman. We ver learned her name. Call the blonde woman. Don't you ink if Mr. Ruiz were involved and he were a partner that rvajal would have said, Call Mr. Ruiz? He'll be there. In :t, he'll be the guy driving. If you can't reach me, he's

Page 1099

t a cell phone. Go ahead and find him. You can do it. He dn't do it because Mr. Ruiz wasn't involved.

Carvajal said, the conversation that Mr. Diaz scribed, we didn't actually play the tape. He said, Carvajal id, I'm risking $40- or $50,000 on this deal. He's trying to ll them what risk he's taking. Not we. Not the syndicate. m. This is Mr. Carvajal show.

Now, the woman is the closest thing that Carvajal had a partner. You remember Carvajal telling Jose Diaz, r. Diaz described this, that some women don't really iderstand the trust that goes on between a man and a woman. I n't know if that's true, but that was Carvajal's view. But says this woman, this woman, she understands, we get along, u can trust her. You know her, he says to Diaz. You know is woman. You can trust her. So he's bringing that woman o the deal.

On cross-examination, Mr. Diaz said, and I'll read you e question, Page 444, if anyone's taking notes.

Question: He did say if you had a problem and you uldn't reach him — meaning Carvajal — you should call a oman, the same woman he talked about earlier on the stand day, right?

Answer: Yes, sir.

And later on, when Mr. Buchwald in cross-examination ked about what Mr. Diaz should do when he comes back, Diaz

Page 1100

[1] said that Carvajal told him, "If you can't find me, call the
[2] blond woman."
[3]    Now, I asked the same question — lawyers should know
[4] not to do that. And Diaz, now realizing the significance of
[5] that, said, "Well, I don't really remember," you know. He
[6] didn't really say it didn't happen, but he said he didn't
[7] recall it. But you know through Mr. Buchwald's cross that that
[8] was the statement: Call a woman if you can't get Carvajal when
[9] he gets back.
[10]   And Carvajal himself, when he pled guilty, standing in
[11] front of a judge in this courthouse, taking responsibility for
[12] this, he said — and this was read to you in evidence —
[13]   The Court: First of all, who did you make these
[14] arrangements with?
[15]   Carvajal: This lady who had me making all the
[16] arrangements.
[17]   The Court: Did you have an agreement or an
[18] understanding with her?
[19]   Mr. Carvajal: Yes, sir.
[20]   The Court: What was it to do? What was the agreement
[21] to do, what you and she would agree would happen?
[22]   Mr. Carvajal: I was supposed to speak to someone to
[23] make sure the heroin got picked up, and when I got it here to
[24] see that it was delivered to her.
[25]   All right? So the someone he's speaking about is

Page 1101

[1] Diaz. But he must deliver it to a woman.
[2]    Now, why didn't the government call this woman to the
[3] stand? I couldn't call her, I don't even know who she is.
[4] She's a mystery woman. She's an informant, apparently. I
[5] don't have control over her. The government could have called
[6] her and put her on the stand and say, I wasn't running this
[7] show.
[8]    Well, you know why they didn't do that? Because she
[9] was. You can tell from the evidence that she was involved.
[10] She was certainly heavily involved. Evidence about Mr. Ruiz
[11] never in fact even existed, or if the woman knew that there was
[12] a Mr. Ruiz, you know they would have called her, put her on the
[13] stand.
[14]   Now, the government may get up and say, Well, you
[15] heard Agent Galbadis on the stand and he told you that drug
[16] dealers are very secret about how they run their business. You
[17] know that's not Carvajal. Carvajal is the guy who'll tell
[18] anybody about anything to tell them what he's doing. He's just
[19] met the Diazes to send them on this trip. What does he do? He
[20] tells them the name of his supplier.
[21]   (Continued on next page)

Page 1102

[1] MR. EISEMANN: He tells them that he has a deal going
[2] with somebody else in Brazil. He told them that's an Italian
[3] guy that's doing some sort of smuggling. He didn't just tell
[4] them about these people. Carvajal gives Diaz the name of the
[5] guy in Colombia. He is setting Diaz up to eliminate Carvajal
[6] as middleman. Now Diaz can work directly with the guy in
[7] Colombia. He has his phone number. So, if the government
[8] tries to say that if you look at the evidence, who in their
[9] right mind gives outsiders that kind of information except a
[10] person that tends to talk about everything, you know with that
[11] kind of background, he would have talked about Mr. Ruiz if he
[12] were involved.
[13] There are a couple of questions that need answering.
[14] One is why was Mr. Ruiz there that night. Well, before I tell
[15] you what I think the inferences are from the evidence, let me
[16] start by saying this is not a movie script, not a TV show.
[17] People do things in real life that don't fit the nice kind of
[18] plot the writer of a script would do if this were a movie.
[19] Hector Ruiz is in the car that night. The writer of the movie
[20] would say, well, why should I put a guy there that's giving a
[21] ride, that doesn't advance the plot, Ruiz is going to be
[22] involved.
[23] That's really what the government has done here. They
[24] have tried to take facts that don't really support their story
[25] and to argue that they support a story. There is no evidence

Page 1103

[1] that there was a call to Ruiz to be involved in this, nothing
[2] to lead you to believe he was involved, except for the fact he
[3] is on the scene. People do things for many reasons. They
[4] could have been out for dinner together, Carvajal says, do me a
[5] favor, I have to pick something up. He could have said I will
[6] be back in minute. The problem is Carvajal is not a witness.
[7] He can't be; he has his own case. Nobody knows what's going on
[8] in the car, including you, by the way, including the
[9] government, including the agents. So, you don't know, and this
[10] is what I tried to say when I first, in my opening remarks, you
[11] don't know what happened. Not knowing is the kind of thing
[12] that leads to acquittals and requires acquittals.
[13] Look, maybe even Carvajal said, Hector, can you give
[14] me a ride. Maybe they are out to dinner, I have to do some
[15] illegal business, I am going to, get your car, going to meet
[16] some other people there, you stay in the car. You know that's
[17] what happened. Ruiz stays in the car. Even if he says I am
[18] going to do another crime or doing something, that doesn't make
[19] Mr. Ruiz part of the conspiracy. Judge Berman is going to
[20] instruct you on that. He has to say, by the way, thanks for
[21] giving me a ride, I have to pick up a kilogram of heroin, pick
[22] up a big shipment of heroin, can you give me a ride so you can
[23] drive me someplace. If Mr. Ruiz does that, he is part of the
[24] conspiracy. There is no evidence that he did, just that
[25] inference, and a thin one really, not supported by any of the

Page 1104

[1] other evidence that I have been talking about.
[2] I told you that Hector did not get out of the car. He
[3] stayed in the car. That's consistent with Carvajal not wanting
[4] him to be involved, even protecting him. He is his friend
[5] after all, this is not a TV script. You don't have to bring
[6] your friends along, engage them in drug transactions. There is
[7] no reason to have Carvajal tell Hector what he is doing there.
[8] He can get a ride, pick up a suitcase. You know he is going to
[9] be delivering it to the woman, so Hector is not the person who
[10] is getting the suitcase, he is just a taxi service essentially,
[11] for a friend.
[12] There was no plan for Hector to meet the Diazes.
[13] Carvajal didn't bring them over to the car, didn't bring Hector
[14] over to their car when they finally talked. I will talk about
[15] that. Carvajal gets out of the car with the suitcase, Diaz's
[16] car, Diaz stays in the car, Carvajal walks over to Mr. Ruiz's
[17] car, puts the suitcase in the back seat, or the back, I am not
[18] sure, gets in. Presumably they were about to drive away from
[19] the scene. Well, why is Mr. Ruiz coming all the way to the
[20] scene if he is not going to meet the people, pay the people,
[21] whatever argument the government wants to construct why he came
[22] here? Because he was not involved, because Carvajal said to
[23] him stay in the car, I will be back in a minute.
[24] When Carvajal, unbeknownst to Mr. Ruiz, Carvajal
[25] thinks there is lot of heat in the area for whatever reason,

Page 1105

[1] maybe he saw the agents, he tells Diaz to circle the block.
[2] That's what the government's Spanish translator says, circle
[3] the block, Government Exhibit 113 in evidence. Why would they
[4] circle the block if the heat is on as Mr. Diaz says. By the
[5] way, they flashed the lights on Mr. Ruiz sitting in his Jeep,
[6] Mr. Ruiz made a U-turn, followed them around. What would be
[7] the purpose of doing that if there is heat in the area, circle
[8] around the block, come back to almost the same spot and wait.
[9] I submit what happened is what the agents basically
[10] said. They simply saw the car driven by Diaz pull up behind
[11] the car where Mr. Ruiz was. Maybe it was after Diaz and
[12] Carvajal circled the block, but you know from Agent Haley, the
[13] woman, she said she prepared a report of all the agents'
[14] observations. She boiled it down. That report simply said,
[15] Carvajal and Diaz pulled up behind the Jeep. You know the
[16] agents knew about the Jeep before then. They had seen it about
[17] a week before. You saw the video. They know, they believe
[18] Carvajal is driving a Jeep. They think it is Carvajal's car at
[19] that point.
[20] If the Jeep followed around don't you think one of the
[21] many, many agents who were there would have told Agent Haley to
[22] put in her report car driven by Ruiz circled around, either led
[23] or followed other car. It didn't happen. That's why it's not
[24] there. Diaz who is about to exchange, knows they are about to
[25] be arrested has a heroin filled dummy suitcase, is not going to

Page 1106

following in the rearview mirror what Mr. Ruiz is supposed
be doing in the Jeep. He thinks Mr. Ruiz followed him
ause that seemed to be the plan of Carvajal. He flashed the
ts so he can either follow around the block with this car
his van, it's not a big deal whether it's car or van; it
uld be accurate whether it's man or van. If it's man, I
k there is a little better inference they are talking about
guy, he is involved, versus the car. It's a subtle point,
the translation was not exactly clear. Diaz thinks Hector
z followed or circled, I am talking about that, but he
n't.

s yourselves, if Mr. Ruiz is the big partner back in
v York, he is so secretive, so good, he is a good, big man in
drug organization because you don't hear a thing about him,
perates in this stealth mode, why would he get in the car
ie most public place to do the most dangerous and riskiest
of the drug deal, be on the street, be there to receive
suitcase, be right in front, not parked 8 blocks away. He
ght there. If he is a boss or partner, why isn't he just
ome. You know why. Because Mr. Carvajal, being the drug
er he was, didn't have a car. You know he didn't have a
because he said that in the conversation which I will get
a minute that he had with the mystery woman which we
lated in evidence, September 4, 2002.
he woman says, you don't have a car, honey. Carvajal

Page 1107

no, not until this weekend. She says, well, but do you,
terrupts her, says I have to. She continues, do you have
ne who will lend it to you. Carvajal says, well, I have
one who will lend it to me, but the thing is, I don't like
e people just to ask them to lend me a car. Why is that
rtant. Because Carvajal had asked Mr. Ruiz to borrow his
efore. And now he is going to ask him again. He doesn't
o do that, so, he is saying, to her, I don't like to just
w cars from people, that's all I am doing, saying can I
w the car. What does he do? Assume he takes him out to
r or something. He is with him, basically uses him for
ar.

case is perfect. Every defendant who is ever
tted in a criminal case, I submit to you that's what you
d do, every one of them has things that need to be
ined. If they didn't they wouldn't be on trial, there
In't be an arrest, an indictment. There are certainly
that require an explanation, but you heard evidence of
ou can hear what the explanation is, you can decide
g yourselves.
oin in the console, it's a problem. If I were
ing this case, I wouldn't want to have it there. It has
explained. It has to fit the government's theory of the
o if the theory of the case is that that's a sample for
ug dealer Hector Ruiz, the factory worker who gets up at

Page 1108

[1] five in the morning every day, takes care of his daughter, if
[2] it is a sample, it's not part of this deal because Carvajal
[3] didn't have time to open that suitcase, take out a sample, put
[4] it in the bag, put it in the suitcase. This happened very
[5] quickly. The sample was there before.
[6]     Where did the sample come from? Easy. That's
[7] Carvajal's sample. He was obviously using Mr. Ruiz's car when
[8] he was doing drug business. You saw it on that occasion. Who
[9] knows how many other times he borrowed the car. Carvajal might
[10] have used it as a sample. He left it in the console. You saw
[11] the photograph the government put up. There was Nothing else
[12] in the console. It closes down. I don't know how many of you
[13] have a console in your car. You don't put things in there. I
[14] have one. I never open it. There could be something in there
[15] for months. Until my wife makes me clean the car out, I don't
[16] know what's in there.
[17]     Just because Carvajal leaves a sample in that car
[18] doesn't mean Mr. Ruiz knew about it, doesn't mean it has
[19] anything to do with Mr. Ruiz. If we didn't have evidence that
[20] Carvajal used his car, it might be a bad fact. But it's
[21] Carvajal's. You don't know, none of you can figure whose
[22] sample that was; therefore, that gives me reason to say it's
[23] Carvajal's.
[24]     A second possibility, I am not saying this is a strong
[25] argument if you are considering whether there is reasonable

Page 1109

[1] doubt, is that it is a personal use quantity. Maybe it's for
[2] Carvajal's use; maybe he is a drug addict. We don't know.
[3] Maybe it's Mr. Ruiz's. You heard his cousin say she doesn't
[4] think he uses drugs, he is kind of secretive, I am sure I would
[5] know. I am not saying he is a drug user, but when you are
[6] trying to figure what that little personal use quantity, as
[7] Mr. Diaz said, doing in his console when we don't know anything
[8] about the other guy's personality or makeup, whether he is a
[9] drug addict. We don't know anything about Hector Ruiz except
[10] for the character evidence that I put on the stand. I didn't
[11] ask any questions about his personal drug use. Frankly, nobody
[12] would know about it; it's not the kind of thing you would share
[13] with somebody.
[14]     The government could have subpoenaed his friends and
[15] family. If they wanted to prove he wasn't a drug dealer, they
[16] could have subpoenaed the witnesses.
[17]   **MR. MUKASEY:** Objection; move to strike.
[18]   **THE COURT:** Overruled.
[19]   Mr. Eisemann, you have 5 minutes left.
[20]   **MR. EISEMANN:** I have 9 minutes by my watch.
[21]     If you believe that it really was, that Mr. Ruiz
[22] really was a drug dealer, then you can only convict if you
[23] think that heroin in the console is part of his drug dealing,
[24] you can convict him for that amount of heroin, only if you
[25] believe that that heroin was part of this conspiracy charged in

Page 1110

[1] the indictment. The law requires that a person be on trial
[2] only for what's charged in the indictment. I can tell you I
[3] could prove Mr. Ruiz is a drug dealer. That sample was part of
[4] the deal he was doing with all the people on that supposed chit
[5] sheet Juaco, John G., all those guys and other drug deals. I
[6] could say that to you. You would still have to acquit him,
[7] because here with the due process and fair play we have, he can
[8] only be convicted of the crime if it is charged in the
[9] indictment.
[10]     There is no charge that Mr. Ruiz conspired with other
[11] people, so if you go back to the jury room and say I don't
[12] know, maybe he is doing drug deals with other people, that
[13] sample is there, one of you ought to remember that the law
[14] requires that it has to be a conspiracy with these people.
[15] It's not a movie script. There may be overlap. Even if you
[16] think he is dealing drugs, of course it's a ridiculous idea, I
[17] am telling you how you can analyze very theoretically whether
[18] he was involved or not. It doesn't have to be real evidence.
[19] We are all reduced to making argument how he is or not
[20] involved. I will tell you to stop at lack of evidence and
[21] acquit. If you are going to debate what it could be, meaning
[22] an inference you can draw, that's an inference for you.
[23]     Just to remind you, the issue about whether Hector
[24] Ruiz would loan Carvajal his car, give him a ride, we put those
[25] witnesses on for a reason. That's Hector's makeup. He will

Page 1111

[1] give you a ride in the middle of the night. I don't know if he
[2] called him yelling pick me up in the middle of night, can you
[3] give me a ride, or he was out to dinner. I may know, but the
[4] evidence before you doesn't know show that. The point is that
[5] you should note that Mr. Ruiz is a nice guy, would give people
[6] a ride, and he did it. He did it. I think it was in evidence,
[7] he gave rides to people at work. That part came into evidence.
[8] It's not unusual. You shouldn't be surprised that he is giving
[9] a ride to his friend.
[10]     With the exception of the chit sheet — withdrawn. I
[11] will take a moment to talk about the drugs. I was a physics
[12] major in college, I will be brief. I have only about 5 minutes
[13] left. The chemist when he did his sample, this is a flaw, I
[14] remember one of you is a biology professor, you have a mixture
[15] here. There is no testimony that mixture is homogenous, no
[16] testimony how it's made, no testimony whether it was heroin put
[17] in a solution then mixed in that rubber somehow. I don't know
[18] if they would mix. No evidence they make a layer of rubber,
[19] sprinkle heroin in there. You don't know because the
[20] government didn't have it; the chemist didn't do it.
[21]     You don't know whether that's a consistent mixture.
[22] To go through that big piece, weighs about 4.3 kilograms, take
[23] 12 samples which collectively amounted to 211 milligrams,
[24] that's means 1/1000 gram, by my calculation, 1/5000 of the
[25] whole thing he sampled. He didn't test each sample to say

Page 1112

[1] sample 1 contained so much heroin, sample 2 contained so much
[2] heroin, and find out that through his test there was
[3] consistency throughout there. He didn't do that. He assumed
[4] it would be consistent. He took those samples, put them
[5] together, tested that, found it didn't contain 25 percent.
[6]     We know that quantitative scientific tests have a
[7] margin of error, not in evidence, but your common sense. There
[8] is a competence level, what percent competence you can have in
[9] the result. If he is off by 3 percent, how he calculated that
[10] 25 percent, said that's the whole thing, or even the gas
[11] chromatogram that he used, that error in the sample reaches 3
[12] percent multiplying that teeny-weeny sample by 25 percent
[13] multiply 25 percent of that sample by the whole thing would
[14] yield less than 1000 grams or 1 kilogram. That's reasonable
[15] doubt.
[16]     The law treats people who distribute and conspire to
[17] distribute between zero and 199 grams the same —
[18]     MR. MUKASEY: Objection.
[19]     THE COURT: Overruled.
[20]     MR. EISEMANN: — as people who distribute a thousand
[21] and one gram, any amount the same. That quantum leap from
[22] people who do smaller and bigger deals just is not established
[23] in this case because there is doubt about the accuracy of that.
[24]     The chit sheet I will talk about briefly. You heard
[25] the evidence. All the people on that, John G, you heard

Page 1113

[1] Mr. Diego Carvajal say, John Gonzalez, Negro, another person at
[2] work, Juaco another person at work, Favio, Mr. Carvajal's
[3] brother who took the stand said I owed him $700. It says $400
[4] on the sheet. He is not an accountant. This is last fall.
[5] Don't held that against him. He is not perfect. That
[6] supports, that discrepancy makes it look more credible. It is
[7] just a list of debts. Mr. Ruiz is not a rich man, but that is
[8] that.
[9]     Look through this which came into evidence, Defendant
[10] Exhibit HRC. You will see Mr. Ruiz is a pack rat, he has all
[11] these numbers on all sorts of cards, insurance cards; he has
[12] cards of autobody shops. Agent Galbadis said drug dealers
[13] drive cars, they carry autobody cards, sometimes they have car
[14] accidents when doing drug deals. The whole thing about the
[15] chit sheet is his opinion. That's it. His opinion, that's it.
[16]     A few more minutes. The most important thing I would
[17] say, the night this happened, you have evidence, Carvajal's
[18] cellphone records. You remember he is arrested about midnight
[19] between the 15th and 16th of September. Look in his cellphone
[20] records. I don't remember the exhibit number. At 9:15 at
[21] night, about 11:00, just before Diaz gets in, calls, says I am
[22] here with the drugs, he calls to a 914 number, 8043454, that's
[23] a Westchester number. Mr. Ruiz lives in Queens. 25 minutes,
[24] 11:27 p.m., same number, 25 minutes, 11:31 p.m., same number,
[25] 56 minutes.


Page 1114

That can't be right because the calls were too close
ether. Many minutes. You look at the exhibit he makes 10
ls between 11:00 at night or 11:08 at night and midnight, 12
iutes after midnight, when he is arrested, who does he call,
t woman. You know that he is calling that woman, that
son who needs to know where the drugs are, not Carvajal.
s is evidence, hard evidence that shows Mr. Ruiz was not a
gpin. You can look, you won't see a call to the number, no
nber about Mr. Ruiz in evidence, because the government
n't put it in. Their records don't support it. The actual
dence when you look at it says he is not involved.
Last, I told you before at the beginning that
sonable doubt does not mean maybe, I think, it might be. It
ans I am sure beyond a reasonable doubt, not probably, even
 if I had to bet on it, it's not good enough here.
isonable doubt is something that protects us from the
'ernment overreaching, and that is what you are going to do.
I are going to say this evidence is not sufficient to inflict
 penalty of a criminal conviction on this man because maybe
was involved, because he wasn't, but the best the government
I was maybe. That's not enough for trial.
I will leave you with one thought. The presumption of
ocence is like the 13th juror who was waiting for you in the
y box when you were being selected as jurors. It's sitting
ide you as the evidence is being developed at trial. It's

Page 1115

l sitting beside you now. Please be kind to the 13th
or. Listen to it. Keep going back there in your
iberations. If you are going to destroy it, if you are
ng to strip Mr. Ruiz of his presumption of innocence, which
 still has, that's how we do it in our system, we are not
e understand Saddam Hussein. If you are going to strip him
 hat, you'd better be really, really sure you are doing the
it thing. You'd better know, you'd better find that's
'ond a reasonable doubt. If you don't have that, ladies and
itlemen, it's your sworn duty as jurors to acquit him.
Thank you.
THE COURT: Mr. Buchwald.
MR. BUCHWALD: I have two copies of the same thing for
) sides of the jury here.
(Pause)
MR. BUCHWALD: May it please the court, ladies and
itlemen of the jury. First let me start by thanking you for
ir attention, your punctuality. That is appreciated by me
l I am certain by all the attorneys and the court. You are
ut to embark on really the most solemn responsibility that
zens in our country have when they sit in judgment on a
ow human being applying the law as his Honor will instruct
 to the facts as you find them from the last weeks and a
, two weeks of evidence.
 am not going to repeat what's been said about

Page 1116

[1] reasonable doubt, who has the burden of proof and presumption
[2] of innocence. Those things were covered in your preliminary
[3] instructions. Judge Berman will cover them again. I am not
[4] going to repeat all of the evidence in this case. But I do
[5] trust in the next 30 minutes that we are going to have an
[6] opportunity to review with you, the evidence which I believe
[7] fully supports the position which I outlined in our opening
[8] statement. Namely, that James Duque was a victim of his
[9] cousin. That James Duque when he learned what finally had
[10] happened on that Sunday morning, when he saw an empty suitcase,
[11] when he saw an exchange of suitcases, when he realized quite
[12] understandably at that point that something was wrong, he
[13] confronted his cousin, and when he determined that his cousin
[14] had been involved in wrongdoing, he realized for the first time
[15] how his cousin had taken advantage of him.
[16]     We tried throughout this trial to really put together
[17] about four different strands of evidence. One was to try to
[18] show and I believe we have shown conclusively that James Duque
[19] had absolutely no part, advertently, inadvertently, no part
[20] whatsoever in anything to do with drugs until the evening of
[21] September 14. Second, we tried to review the facts of what
[22] happened on Saturday night, the 14th, and on the morning of the
[23] 15th, to show you that James' lack of knowledge, his faith and
[24] belief that his cousin was acting legitimately was reasonable
[25] and plausible under all the circumstances known to him.

Page 1117

[1]     Third, we tried to offer proof as to what kind of man
[2] James Duque is and was, so that you could have some way of
[3] judging, should we take James Duque's word for what happened,
[4] or should we take Jose Diaz's word for what happened, because
[5] that's what really what this trial comes down to.
[6]     And fourth, we tried to do the same thing with Jose
[7] Diaz, what kind of a man is he and was he, what kind of
[8] pressures was he under to tell the truth, as my brother and
[9] sister at the prosecution table suggest, or to dissemble, to
[10] exaggerate, to claim that the people he was fooling as an
[11] undercover operative with the DEA were more substantial more
[12] culpable, bigger fish, in order to get more benefit. We tried
[13] to do that with Mr. Diaz, both by exploring his past, and by
[14] testing whether what he said in this courtroom was true or
[15] false. There are a host of occasions where I believe that what
[16] he said was demonstrably false.
[17]     Let me get to Mr. Diaz first; that was longer ago in
[18] the trial. You heard Mr. Jansen yesterday. You heard the
[19] defense case most recently as to what kind of man James Duque
[20] is. Let me review with you what you learned and heard during
[21] the trial about Mr. Diaz. Let me say, preliminarily, you may
[22] have, I believe his Honor will instruct you, if you have doubt
[23] about what a witness said, about what a piece of evidence was,
[24] you can request during your deliberations a rereading of that
[25] testimony, you can ask to see copies of any of the exhibits