GOVERNMENT EXHIBIT 404 S1 02 Cr. 1290 (RMB)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,           :

     - v. -                         :   STIPULATION

JAMES DUQUE,                        :   S1 02 Cr. 1290 (RMB)
WILLIAM SAENZ DUQUE,
   a/k/a "Willie," and              :
HECTOR RUIZ,
                                    :
            Defendants.
- - - - - - - - - - - - - - - - - -x

       IT IS HEREBY STIPULATED AND AGREED by and between the United States of America, by James B. Comey, United States Attorney for the Southern District of New York, Marc Mukasey and Lauren Goldberg, Assistant United States Attorneys, of counsel, JAMES DUQUE, the defendant, by and through his attorney, Don Buchwald, Esq., WILLIAM SAENZ DUQUE, a/k/a "Willie," the defendant, by and through his attorney Michael Sporn, Esq., and HECTOR RUIZ, the defendant, by and through his attorney, Alexander Eisemann, Esq. that:

       1.   If called as a witness, NOEL VADELL would testify as follows:

       a.   He is employed as a Forensic Chemist at the Northeast Regional Laboratory of the United States Drug Enforcement Administration ("DEA") and he has been so employed for six years;

       b.   His responsibilities as a forensic chemist consist primarily of testing different items for the presence or

non-presence of controlled substances and he has performed such tests thousands of times in his career;

  c. On or about September 23, 2002, he received for examination and analysis Government Exhibit 500 ("GX 500"), a blue suitcase with a "Dingxin" label, which had been removed from a secure DEA evidence vault where it had been stored since on or about September 16, 2002;

  d. After he received GX 500, he opened it, and he performed two preliminary chemical tests on its black foam rubber interior lining to test for the presence of a controlled substance. Both tests yielded results consistent with the presence of heroin hydrochloride, commonly known as heroin;

  e. After his preliminary tests, he took apart GX 500 using a drill and removed the black foam rubber interior lining which is now contained in the plastic bag marked as Government Exhibit 501 ("GX 501") from the body of the suitcase. He proceeded to weigh the black foam interior lining and obtained a weight of 4.364 kilograms (or 4,364 grams);

  f. To obtain a representative sample of the lining for use in further testing, he then cut approximately 12 pieces from different, random areas of the black foam rubber lining, combined them together, and ground them up into a black grain-like substance that weighed approximately 26 grams. That sample is contained inside the small plastic bag within GX 501;

g. Next, he took a portion of the sample and ran two confirmatory tests to test for the presence of heroin. Both tests confirmed the presence of heroin in the sample.

h. He then performed gas chromatograph tests on a 211 milligram portion of the sample to determine how much heroin was present in the sample, and he determined that that portion of the sample contained 25% heroin.

i. He then multiplied the percentage of heroin present in the portion of the sample he tested (25%), by the weight of the entire black foam rubber interior lining (4.364 kilograms), and calculated that the black foam rubber interior lining inside GX 501 contains 1.091 kilograms (1,091 grams) of heroin.

j. When he finished testing the black foam rubber interior lining and a portion of the sample, he put them in a plastic bag and sealed the plastic bag, which is now GX 501. He then placed GX 501 and GX 500 in a DEA evidence vault where they remained secure until they were removed and taken to a secure vault in the U.S. Attorney's Office for use at this trial.

k. On or about October 22, 2002, he received for examination and analysis a paper wrapper which contained tan-colored powder inside and is now contained within Government Exhibit 135 ("GX 135"). The paper wrapper containing the tan powder had been removed from a secure DEA evidence vault where it

had been stored since on or about September 16, 2002;

      l.  He removed the tan powder from the packaging, weighed it, and determined that it weighed .44 grams.

      m.  He then ran the same preliminary tests on the tan powder that are described earlier in this stipulation to test for the presence of a controlled substance. The tests of the tan powder yielded results consistent with the presence of heroin.

      n.  He next performed two confirmatory tests on the tan powder to test for the presence of heroin. In each test, a chemical analysis was performed to compare the tan powder in GX 135 to known heroin samples. Both tests confirmed that the tan powder contained heroin.

      m.  When he finished testing the tan powder, he placed it in a plastic bag then sealed these items, along with the original paper wrapper, within the larger DEA evidence bag that is GX 135 and placed it in a DEA evidence vault where it remained secure until it was removed and taken to a secure vault in the U.S. Attorney's Office for use at this trial.

      n.  All the tests he performed and methods he used were in accordance with standard DEA laboratory procedure.

IT IS FURTHER STIPULATED AND AGREED that Government Exhibits 501, 135 and this stipulation may be received in evidence at trial.

Dated:   New York, New York
         June 16, 2003

>                    JAMES B. COMEY
>                    United States Attorney
>
> By:   _____
>       MARC MUKASEY/LAUREN GOLDBERG
>       Assistant United States Attorneys
>       Telephone: (212) 637-2479/1040
>
> By:   _____
>       DON BUCHWALD, Esq.
>       Attorney for the Defendant
>          JAMES DUQUE
>
> By:   _____
>       MICHAEL SPORN, Esq.
>       Attorney for the Defendant
>          WILLIAM DUQUE
>
> By:   _____
>       ALEXANDER EISEMANN, Esq.
>       Attorney for the Defendant
>          HECTOR RUIZ